Gary BURRIS, Petitioner,

v.

Al C. PARKE, Respondent.

No. 3:95–CV–0917 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 26, 1996.

Alan Freedman, Bruce Bornstein, Gary Prichard, Freedman and Bornstein, P.C., Chicago, IL, for petitioner Gary Burris.

Geoffrey Slaughter, Geoffrey Davis, Office of the Attorney General, Indianapolis, IN, for respondent Al Parke, Superintendent, Indiana Attorney General.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Nearly seventeen years after committing the crime for which he was found guilty and sentenced to death, and after an abundance of state and federal review, the petitioner, Gary Burris ("Burris"), now returns to this court for the third time pursuant to a petition for writ of habeas corpus under 28 U.S.C. § 2254. The petition now before this court is Burris's second § 2254 petition and was originally filed on November 14, 1995. This second petition has already taken one extended tour of the Seventh Federal Circuit. Now, pursuant to the order of the United States Court of Appeals for the Seventh Circuit dated September 12, 1996, *see Burris v. Parke,* 95 F.3d 465 (7th Cir.1996), this court is required to address the merits of Burris's second federal habeas petition. In furtherance of the Seventh Circuit's mandate, this court held oral argument on this petition in Lafayette, Indiana, on November 18, 1996. This memorandum will follow up on the proceedings held in open court in Lafayette on November 18 and deal with the issues that were there presented.

### I. FACTUAL BACKGROUND

The facts underlying Burris's death sentence now before the court were succinctly summarized by the Supreme Court of Indiana on direct appeal of his felony murder conviction and first death sentence. The Su-

preme Court of Indiana found the facts underlying Burris's guilt to be as follows:

The evidence most favorable to the State reveals that on the morning of January 29, 1980, Gwen Tevebaugh and her neighbor, Calvin Howard, discovered the body of a dead man in an alley in the 3200 block of East Fall Creek Parkway in Indianapolis. Tevebaugh had been awakened earlier that morning by a noise and then heard what she clearly knew to be a gunshot. Tevebaugh was not able to see anything because of the darkness but she noted the time of 2:23 on her clock.

After Mr. Howard phoned the police, Sergeant Donald Campbell and Officer Jon Layton received the dispatch on the homicide. Upon arriving at the alley, the two men discovered the body, nude except for a pair of socks, lying face down and stuck to the ground by a pool of its frozen blood. Identification found at the scene showed that the deceased was Kenneth W. Chambers, age 31. The police also noticed what appeared to be a small caliber gunshot wound to the right temple.

Elizabeth Gardner, a dispatcher for the Northside Cab Company, identified Chambers as a driver for the company. Chambers drove Cab 305. On the morning of January 29, 1980, both Chambers and Gardner were working. Around 1:30 a.m. Gardner received a call for a cab to pick up fares at the 1800 block of North College. Gardner put a request out for a cab and Chambers responded that he would take the call. Both parties stipulated that a call to Northside Cab was received at 1:48 a.m. for transportation from 1821 North College to 1501 East 38th and that this call was assigned to Cab 305. The call was made by a person identified as "Williams."

1821 North College is the address of the M & J Social Club where Thelma Williams was employed as a barmaid. Williams testified that she telephoned the cab company at the request of defendant Burris. Williams said she knew the defendant and stated he usually ran around with two other men, named "Emmet" and "James." As Williams recalled, Emmet was with Burris at the M & J Social Club on the morning of the murder. Williams assumed the cab arrived within fifteen minutes of her call because Burris left at that time.

Carol Wilkins was another witness called by the State. At the time of the murder, Carol Wilkins was living at 1827 North College above the M & J Social Club. Carol stated that defendant Burris rented the apartment and that he was dating her sister, Debra Wilkins. On January 28, the day before the murder, the defendant arrived at the apartment around 5:40 p.m. Carol testified that James Thompson and Emmet Merriweather joined the defendant. Burris had told Carol that he had a deadline to pay $230 back rent and telephone bills. That evening when Burris left the apartment, he put a .38 pistol in his pocket. Carol identified State's Exhibit 16 as being similar to the .38 pistol.

Later, Burris, Merriweather, and Thompson returned to the apartment. Burris was carrying a clipboard with a paper on it, which he tossed on the bed. Carol had ridden in taxicabs before and recognized the paper on the clipboard as a cab driver's run sheet. The defendant burned the run sheet and flushed the remains down the toilet.

Merriweather and the defendant then had a dispute over a gun. The defendant wanted to give Merriweather the gun but Merriweather refused to take it. The defendant kept the gun. Carol also saw that the defendant had quite a bit of money. There were two wads of money, big enough to create a noticeable bulge in both of the defendant's front pockets. Carol later heard about the cab driver who had been shot and she put the pieces together.

After some police investigation, Emmet Merriweather and James Thompson were arrested in connection with the death of Chambers. Both men, along with other sources, informed the police that the defendant was with them at the time of the murder. Acting upon information that defendant Burris was at Debra Wilkins' apartment and planned to leave town, the police moved quickly and arrested Burris at 2035 North Meridian in Indianapolis. A search of the apartment revealed that a

sawed-off shotgun and a .38 pistol were hidden in a stereo speaker. A member of the Indianapolis Police Department Crime Lab testified that the .38 pistol was used to kill Chambers. This witness, during the penalty phase of the trial, also testified that the pull of the pistol's trigger made it a little harder to shoot than an average weapon. The gun had no observable mechanical defect and did not exhibit any propensity for accidental discharge.

A pathologist, Dr. Robert Ransburg, testified that the body had a gunshot entrance wound in the right temple. Dr. Ransburg stated that the wound was a "contact wound." By this he meant that the muzzle of the gun would have had to have been held against the temple to create such a wound. Other forensic specialists testified that the victim's blood type and the bloodstain on the recovered .38 pistol were both type A.

One of the chief witnesses for the prosecution was William Allen Kirby. Kirby had shared a cell with defendant Burris in the Marion County Jail where the defendant admitted his involvement and culpability in the murder. Kirby agreed to testify against the defendant and recounted the defendant's story as follows: The defendant and his friends were in need of money. They entered a dance contest but failed to win anything. They took a cab to the "M & L Club" (Kirby said he was not sure "M & J Social Club" was what the defendant said but he knew the name was alphabetical) and on the way to the club, the defendant saw an envelope containing money on the front seat of the cab. Kirby asked why the men did not take the money at that time. The defendant replied they were not prepared to do so because they did not have their "roscoes" (pistols).

Inside the "M & J Social Club" the defendant said to his friends that he was ready to get some "paper" (money). Defendant Burris told his accomplices that he would kill during the robbery if that would keep him out of prison. Burris went up to his apartment, picked up a pistol, and had Thelma Williams call for a cab.

After the cab arrived, the defendant and the other two men told the driver to proceed to 21st and Alvord. After proceeding only a couple of blocks on 21st, the three men drew their pistols, forced the driver to call in that his run was completed, and ordered the driver into the back seat. The cab was driven to an alley off 34th Street where the cab driver's clothes were thrown out. Then, in an alley between Guilford and Fall Creek Parkway, the driver was forced out of the cab. The driver pleaded for his life, saying, "Man, take the money, take the cab, leave me alone, I'm not going to bust you, you know, I'm a street fellow, too." This plea for mercy had no effect on the defendant. The victim's hands were bound and then the defendant shot Chambers in the head. The defendant told Kirby he used .38 hollow point shells because he thought they would explode on impact and thus leave nothing that could be identified through ballistics.

*Burris v. State*, 465 N.E.2d 171, 175–77 (Ind. 1984), *cert. denied*, 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985).

## II. PROCEDURAL HISTORY

As Justice Fortas once wrote, "a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.'" *Harris v. Nelson*, 394 U.S. 286, 291, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969) (quoting *Price v. Johnston*, 334 U.S. 266, 269, 68 S.Ct. 1049, 1052, 92 L.Ed. 1356 (1948)). Upon review of the extensive record in this case, it appears that Justice Fortas's admonition has not been adhered to. This case began in late January 1980 when Burris was arrested for the murder of Kenneth Chambers, an African–American taxi driver from Indianapolis, Indiana. The State of Indiana sought the death penalty in Burris's case because the murder was an intentional killing committed in the course of a robbery. *See* IND.CODE §§ 35–50–2–9(a), (b)(1)(G). On December 4, 1980, a jury in the Superior Court of Marion County convicted Burris for the felony murder of Kenneth Chambers. The following day, the same jury recommended that Burris receive the death penalty for his crimes. On February 20, 1981, Judge John Tranberg agreed with the jury's recommendation and sen-

tenced Burris to death. Burris's conviction and sentence were affirmed by the Supreme Court of Indiana on June 22, 1984, and the Supreme Court of the United States denied Burris's petition for writ of certiorari on January 7, 1985.

After failing on his direct appeal, Burris filed a petition for post-conviction relief ("PCR") in the Marion County Superior Court. On May 30, 1986, Judge Roy Jones, acting as special judge, denied Burris's PCR petition. Burris then appealed this decision directly to the Supreme Court of Indiana. On August 24, 1990, the Supreme Court of Indiana affirmed the denial of Burris's PCR petition as to the determination of guilt. However, in a 3–2 decision, the Supreme Court reversed the post-conviction court's finding that Burris was not denied the effective assistance of counsel at the penalty phase of his trial and remanded the case to the trial court for a new sentencing trial. *Burris v. State*, 558 N.E.2d at 1076–77. It is this decision which bifurcated Burris's conviction from his sentence, and the point when the petitioner's claims began the trek into the "judicial morass."

The court will first address the procedural background of Burris's conviction. On December 20, 1992, Burris first sought federal review of his felony murder conviction in this court. He filed this first habeas petition even though the direct appeal challenging his second death sentence was still pending before the Supreme Court of Indiana. For the first habeas petition, David Vandercoy, a professor at Valparaiso University School of Law, was appointed as counsel for Burris. Both Burris and Professor Vandercoy were well aware that issues affecting Burris's second death sentence had not yet been exhausted, but the decision was made to confine Burris's first habeas petition to claims affecting only his conviction. On January 27, 1994, after careful and extensive consideration, this court denied Burris's first habeas petition on the merits. *Burris v. Farley*, 845 F.Supp. 636 (N.D.Ind.1994). On March 28, 1995, the United States Court of Appeals for

the Seventh Circuit, speaking through Circuit Judge Easterbrook, affirmed this court's denial of Burris's first habeas petition. *Burris v. Farley*, 51 F.3d 655 (7th Cir.1995). Burris did not seek a writ of certiorari on his first habeas petition.

The procedural history of Burris's sentence after the Supreme Court of Indiana's remand to the state trial court began when a completely new jury was empaneled for the second sentencing trial in the Marion County Superior Court. After hearing the evidence presented during the second sentencing trial, this jury was unable to reach a unanimous sentencing recommendation and, consequently, was discharged by Judge Patricia J. Gifford. Judge Gifford then sentenced Burris to death for the second time on November 22, 1991.[1] Burris again took a direct appeal of his second death sentence to the Supreme Court of Indiana. This time, on November 4, 1994, the Supreme Court affirmed Judge Gifford's decision to sentence Burris to death. *Burris v. State*, 642 N.E.2d 961 (Ind.1994). Subsequently, the Supreme Court of the United States denied Burris's petition for writ of certiorari. *Burris v. Indiana*, ——— U.S. ———, 116 S.Ct. 319, 133 L.Ed.2d 221 (1995).

On June 14, 1995, the Marion County Superior Court set Burris's execution date for July 19, 1995. However on June 16, 1995, Burris filed with the state trial court a notice of intent to file a new PCR petition to challenge, for the first time, aspects of his second death sentence. On June 30, 1995, the state trial court held that any PCR petition filed by Burris would be considered a successive petition that must be first tendered to the Supreme Court of Indiana pursuant to Rule 1, Section 12 of the Indiana Rules of Procedure for Post–Conviction Remedies. Also on June 30, the Marion County Superior Court stayed the July 19 execution date. On July 27, 1995, the Supreme Court of Indiana held that the state trial court correctly determined that any PCR petition that Burris intended to file would be successive. Howev-

---

**1.** Under Indiana law, the jury's sentencing recommendation is not binding on the state trial court judge. If a jury is unable to agree on a sentence recommendation after reasonable delib-

erations, the court is mandated to discharge the jury and proceed with sentencing as if the hearing had been to the court alone. *See* IND.CODE § 35–50–2–9(f).

er, the Supreme Court also held that the state trial court lacked jurisdiction to stay Burris's execution. As a result, the Supreme Court vacated the stay, and ordered that another execution date be set by the state trial court.

Judge Gifford subsequently set September 13, 1995, as the new date for Burris's execution. On August 22, 1995, at Burris's request, the Supreme Court of Indiana vacated the September 13 execution date and granted the petitioner until September 30, 1995, to file a successive PCR petition. In such a petition, Burris was required to state with particularity the issues and evidence which would establish that a successive PCR proceeding was warranted. On September 29, 1995, by counsel acting *pro bono*, Burris filed his "successive" PCR petition. However, the PCR petition was denied by the Supreme Court of Indiana on October 19, 1995. Subsequently, the state trial court set November 29, 1995, as the new execution date. On October 26, 1995, Burris requested the Supreme Court of Indiana to stay the execution date pending the filing of his second habeas petition in federal court. However, the Supreme Court denied this request.

As a result, Burris filed his second petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on November 14, 1995—little more than two weeks before the scheduled execution date. In this second petition (the petition that is now before the court), Burris raises six separate constitutional challenges to his second death sentence. The State of Indiana responded to that petition by asserting the affirmative defense of abuse of the writ. On November 20, 1995, this court dismissed Burris's second petition as an abuse of the writ. Burris appealed that decision to the United States Court of Appeals for the Seventh Circuit. The panel of the Seventh Circuit assigned to the Burris case affirmed this court's dismissal of the second petition,

with Senior Circuit Judge Cudahy dissenting. *Burris v. Parke,* 72 F.3d 47 (7th Cir.1995) (per curiam).

However, shortly before Burris was due to be executed, the Seventh Circuit granted the petitioner a stay of execution and decided to hear the case *en banc.* On December 19, 1995, oral argument was heard on this case *en banc.* Before the Seventh Circuit rendered a decision on the appeal, the President of the United States, on April 24, 1996, signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), which contains provisions that amend the scope of federal habeas corpus for prisoners generally and inmates sentenced to death row in particular. Consequently, the Seventh Circuit ordered that the case be reheard again in order to consider how the passage of the AEDPA affected Burris's petition.

On September 12, 1996, the Seventh Circuit, in an opinion authored by Chief Circuit Judge Posner, reversed this court's decision, holding that the State of Indiana waived its abuse of the writ defense in the first petition. *Burris v. Parke,* 95 F.3d 465 (7th Cir.1996) (*en banc*) (Manion, J. and Kanne, J., concurring). Specifically, the Seventh Circuit held that § 106(b)(2) of the AEDPA (amending 28 U.S.C. § 2244(b)(2) which deals with the filing of successive habeas petitions) was not to be applied retroactively to Burris's second petition. *Id.* at 469. Thus, applying the law as it existed prior to the AEDPA, the court found that Burris had been "mousetrapped" in the first petition since this court and the State of Indiana neglected to inform him during oral argument of the implications of proceeding solely on the determination of his guilt without waiting for the death sentence claims to be fully exhausted in the courts of the State of Indiana. *Id.* at 469–70.[2] The court held:

---

**2.** The concept of "mousetrapping" deserves careful and respectful consideration here. The court notes that the concept was first introduced by the Seventh Circuit, speaking through Chief Circuit Judge Posner, in *Reyes–Hernandez v. I.N.S.,* 89 F.3d 490, 492 (7th Cir.1996). There is little, if any, existing definition of that concept. One is not aided by reference to law or general dictionaries for help in analyzing the issue of when

"mousetrapping" is applicable; perhaps, the genesis of the doctrine is found in Agatha Christie's infamous play "The Mousetrap." It appears that the concept may have the verbal qualities of a noun, an adjective or even a verb; indeed, conceptually, it may blend all three. When one looks deeply and carefully at the procedural and factual setting in which the concept of "mousetrapping" was born, it appears to be a label

We are mindful that abuse of the writ is an affirmative defense and that, technically speaking, the pleading of the defense is premature until a second petition is filed; for it is a defense to the second petition, not to the first. But we must be realistic about the circumstances in which the state declined to mention the possibility of such a defense. For page after page of transcript the district judge and the lawyers discussed the ripeness (exhaustion of state remedies) and merits of the petition. The judge was an active participant, displaying his extensive knowledge of habeas corpus jurisprudence. The state urged him to decide the petition on the merits then and there. Everyone knew that Burris had been resentenced to death and that his appeal was pending. Yet no one saw fit to warn Burris of the possible consequences. No one suggested that maybe the district judge should stay action on the petition until state remedies exhausted, Burris could add a challenge to his new sentence. Silence can mislead, and when it does it is treated as speech. We think that in the circumstances the state's silence concerning the implications of an immediate decision on the petition was tantamount to a statement that for the sake of a prompt decision on the merits of Burris's challenge to his conviction the state would forgo the defense of abuse of the writ should he file a subsequent petition limited to the sentence.

*Id.* at 470.[3] In essence, the Seventh Circuit held that the State waived its affirmative defense even before it was possible and proper to raise it in the second habeas petition. Accordingly, the Seventh Circuit remanded Burris's second habeas petition to this court for a determination on the merits.[4] *Id.*

On September 19, 1996, this court ordered the parties to submit supplemental briefs following the Seventh Circuit's decision. The petitioner, by counsel, filed his supplemental memorandum on October 21, 1996. The respondent, by the Indiana Attorney General, filed his supplemental brief on November 12, 1996. On November 18, 1996, consistent with the Seventh Circuit's remand order, this court heard oral argument on the merits of Burris's second habeas petition in Lafayette, Indiana.

In this petition, the petitioner raises six separate constitutional challenges. First, he claims that his counsel during the second sentencing trial—court appointed Indianapolis attorneys Michael R. Fisher and R. Mark Inman—were ineffective because they failed to adequately investigate and introduce mitigating evidence which they allegedly possessed at the time of the second sentencing trial. Second, the petitioner alleges that both sentencing counsel and counsel on appeal—Mr. Inman and court appointed Indianapolis attorney Nancy L. Broyles—were ineffective when they either failed to object to, to preserve for appeal and to present on appeal six separate grounds for relief.

Third, Burris claims that the state trial court violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by allowing the State to introduce, and the jury to consider, evidence pertaining to an improper, non-statutory aggravating circumstance—victim impact evidence. Fourth, Burris argues that Indiana's death penalty statute fails to narrow the class of death penalty-eligible defendants, making his second death sentence arbitrary and capricious under the Eighth and Fourteenth Amendments. Fifth, he claims that the Indiana death penalty statute as applied

chosen to deal with the recurring problem of deciding when an act of Congress is retroactive—an equitable concept to decide when a newly enacted or amended statute will become applicable to pending proceedings that are in transition from state to federal courts. Whatever the true meaning of "mousetrapping" may be, the Seventh Circuit has released the petitioner from the "trap," requiring this court to now address the merits of his second and successive habeas petition.

**3.** In this court's view, the Seventh Circuit's holding presupposes a very high level of federal judicial activism in a non-*pro se* habeas corpus proceeding under 28 U.S.C. § 2254.

**4.** It is undisputed that this second habeas petition is limited to challenges on Burris's second death sentence, since the issue of Burris's guilt with regard to the murder of Kenneth Chambers was conclusively determined in the courts of the State of Indiana and through his first habeas petition.

in this case is unconstitutional because the sole aggravating factor alleged by the State also functioned as an element of the crime and, thus, required a jury determination. Sixth, Burris argues that the state trial court violated the Eighth and Fourteenth Amendments by improperly overruling his objection to a jury instruction that erroneously informed the jurors that, if they did not recommend the death penalty, the state trial court was mandated to sentence Burris to a term of years in prison.

Additionally, the petitioner argues that he is entitled to receive an evidentiary hearing on his claims that sentencing and appellate counsel were constitutionally ineffective because he did not receive a full and fair opportunity to present evidence on these claims in his state court petition for post-conviction relief. In conjunction with this request, Burris also moves the court to appoint a neuropsychologist, pursuant to 21 U.S.C. § 848(q)(9) and (10), to examine him in order to develop his claim that he suffers from brain dysfunction or other neurocognitive defect. Because the Seventh Circuit has decided that the petition before the court is a successive petition which does not abuse the writ under pre-AEDPA standards, this court must now address the standards of review which are applicable to the merits of this petition following the enactment of the AEDPA.

### III. STANDARDS OF REVIEW

In order to keep the nature of habeas corpus in the United States courts in proper perspective, all concerned are referred to this court's memorandum and order in *Smith v. Farley,* 873 F.Supp. 1199, 1203–05 (N.D.Ind.1994), which briefly traces the origins of habeas corpus jurisprudence in the United States.

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur— reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has recently codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996),[5] the Seventh Circuit, speaking through Circuit Judge Easterbrook, held that § 2254(d), as amended, should be applied to petitions pending when the AEDPA was enacted. The Seventh Circuit found that "[t]he 1996 Act does not 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Id.* at 867 (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 280–81, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994)).

Burris argues that based upon the unique factual background of this case, coupled with an analysis of *Lindh*, the court must apply a *de novo* standard of review on his ineffective assistance of counsel claims. He contends that the Supreme Court of Indiana denied him an opportunity to litigate fully his ineffective assistance claims during post-conviction review in the state courts, as required by *Lindh*. *See* 96 F.3d at 871. Further, he

claims that said failure to litigate the claims in the state courts was through no fault of his own. In addition, the petitioner claims that the decision by Supreme Court of Indiana not to allow him to file a PCR petition on the second sentencing trial cannot be considered a careful and well-reasoned opinion requiring deference by this court—again, requiring this court to review the ineffective assistance claims *de novo*. *See Id.* at 877.

The State contends that the court should reject Burris's argument for *de novo* review. The respondent argues that the Supreme Court of Indiana reviewed Burris's PCR petition, the affidavits attached thereto, its own three prior opinions in this case, and the various orders which it had issued before deciding that Burris's PCR petition on the second sentencing trial was successive under Indiana law. Thus, the respondent requests that the court analyze Burris's ineffective assistance claims under the amended standards of § 2254(d). The decision at issue here is the October 19, 1995, ruling of the Supreme Court of Indiana that denied Burris's PCR petition on the second sentencing trial as a successive petition under Indiana Post–Conviction Rule 1 § 12. In that order, the Supreme Court of Indiana, speaking through Chief Justice Shepard, held:

Burris now claims his counsel was ineffective in connection with his sentencing, primarily because certain facts were not presented as part of his mitigation strategy. He asserts these facts should be considered in a successive post-conviction proceeding. The Court has reviewed these claims and the materials submitted in sup-

5. The court must note that a petition for writ of certiorari was filed in *Lindh* on October 10, 1996. Further, the circuits are split on the retroactivity of § 2254(d). In *Drinkard v. Johnson*, 97 F.3d 751, 764–66 (5th Cir.1996), the Fifth Circuit held that the new standards of review contained in § 2254(d) should be applied to cases pending on the date the AEDPA was enacted. It also appears that the Eleventh Circuit, in dictum, has agreed with the Seventh Circuit's holding in *Lindh* that sections 101–106 of the AEDPA are to be applied to habeas petitions pending on the date of enactment. *See Hunter v. United States*, 101 F.3d 1565, 1570 n. 3 (11th Cir.1996). The Second and Tenth Circuits, on the other hand, have held that the AEDPA's changes to § 2254 are not to be applied retroactively. *See Boria v. Keane*, 90 F.3d 36, 37–38 (2d Cir.), *petition for*

*cert. filed*, 65 U.S.L.W. 3342 (Oct. 11, 1996); *Edens v. Hannigan*, 87 F.3d 1109, 1112 n. 1 (10th Cir.1996). Additionally, two other circuits have affirmatively declined to address the retroactivity of the new act. *See Berryman v. Morton*, 100 F.3d 1089, 1104 (3d Cir.1996), and *Preston v. Delo*, 100 F.3d 596, 599 n. 4 (8th Cir.1996). Because the Seventh Circuit has spoken on this issue, this court is mandated to follow the court's holding in *Lindh*. However, the court also notes Burris's request to preserve for further review those issues raised in the petition for writ of certiorari filed by the petitioner in *Lindh*. For further discussion on *Lindh* in the Seventh Circuit, *see Bocian v. Godinez*, 101 F.3d 465 (7th Cir.1996), *Fern v. Gramley*, 99 F.3d 255, 256 (7th Cir.1996), and *McCain v. Gramley*, 96 F.3d 288 (7th Cir.1996).

port of them. Though pled as an ineffective assistance claim, Burris's contentions are essentially an assault on the adequacy of the mitigating evidence submitted on his behalf, an issue we have already examined twice. We find that these claims are either barred by the doctrine of *res judicata* or otherwise barred by the Indiana Rules of Procedure for Post–Conviction Relief. *Burris v. State,* No. 49S00–9509–SD–1112, at 1–2 (Ind. Oct. 19, 1995).

This court must review the above-referenced order of the Supreme Court of Indiana to determine whether it can be considered a careful and well-reasoned opinion requiring deference under *Lindh,* 96 F.3d at 877. In *Lindh,* the Seventh Circuit found that the opinion of the Supreme Court of Wisconsin on petitioner Lindh's appeal was carefully entered because the opinion correctly stated the holdings of precedential decisions from the Supreme Court of the United States and did not transgress any clearly established principles. *Id.* Thus, the Seventh Circuit found that the decision of the Supreme Court of Wisconsin was entitled to deference. *Id.*

■ In this case, the court finds that the October 19, 1995, decision of the Supreme Court of Indiana cannot be considered a careful and well-reasoned opinion requiring deference under § 2254(d). As the respondent noted in his brief, the post-conviction process in Indiana "is not a substitute for a direct appeal, but is a process for raising issues not known at the time of the original trial or for some reason not available to the defendant at that time," citing *Wallace v. State,* 553 N.E.2d 456, 458 (Ind.1990), *cert. denied,* 500 U.S. 948, 111 S.Ct. 2250, 114 L.Ed.2d 491 (1991). A review of the lengthy record in this case establishes that the PCR petition which was denied as successive by the Supreme Court of Indiana was in fact the first such petition challenging certain aspects

of Burris's second death sentence. It cannot be disputed that Burris has time and again challenged the sufficiency of the mitigating evidence presented on his behalf. However, in the PCR petition, Burris was for the first time attempting to challenge the effectiveness of his counsel in the second sentencing trial and subsequent appeal.

Further, it would have been impossible for Burris to raise his ineffective assistance of counsel claims on direct appeal of his second death sentence for two reasons. First, Burris's sentencing counsel and appellate counsel were, in part, the same attorney. Second, Burris claims not only that his sentencing counsel were ineffective but also that counsel on appeal violated his Sixth Amendment rights by failing to present several grounds for review on direct appeal. Additionally, unlike the decision of the Supreme Court of Wisconsin in *Lindh,* which clearly delineated the applicable law on the issues presented in Lindh's appeal, the Supreme Court of Indiana did not even address Burris's ineffective assistance claims for what they were: allegations that counsel violated his rights under the Sixth Amendment to the United States Constitution. Therefore, the court finds that the October 19, 1995, decision of the Supreme Court of Indiana is not entitled to deference under § 2254(d), and the court will review *de novo* Burris's claims of ineffective assistance of counsel under the Sixth Amendment.[6]

As for the remaining claims that were raised for the first time on direct appeal of the second death sentence, Burris argues that such claims simply involve pure questions of law which he contends are still reviewed *de novo,* citing *Lindh,* 96 F.3d at 874–75. On the other hand, the State argues that the remaining claims are clearly grounds that were "adjudicated on the merits in State

---

6. In making this finding, the court does not intend to suggest that the Supreme Court of Indiana has "rushed to judgment" in ruling on any aspect of Burris's death sentence. The court also does not aim to imply that the Supreme Court of Indiana has ever treated any sentence of death with short shrift. *See, e.g., Burris v. State,* 558 N.E.2d 1067 (Ind.1990) (reversing first death sentence on appeal of PCR petition); *Schiro v. State,* 669 N.E.2d 1357 (Ind.1996) (vacating

death sentence on appeal of PCR petition after death sentence had been affirmed on direct appeal and federal habeas corpus) (Shepard, C.J., dissenting). The court merely finds that the Supreme Court of Indiana failed in this specific instance to analyze whether Burris's sentencing and appellate counsel on his second death sentence were effective under the appropriate standards set forth by the Supreme Court of the United States.

court proceedings" within the meaning of § 2254(d), as amended. Thus, the State maintains that the remaining claims must be addressed under the narrower standards of the AEDPA.

■ This court does not read *Lindh* as holding that pure questions of law are reviewed *de novo* under § 2254(d), as amended. Although federal courts are allowed to express an independent opinion on all legal issues raised in a habeas petition, *see Lindh*, 96 F.3d at 869, that opinion is limited to the law "as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). Therefore, labeling the review of purely legal issues as *de novo* under the new § 2254(d) is a misnomer; for a petitioner now "must be able to point to an authoritative decision of the Supreme Court in order to secure a writ." *Lindh*, 96 F.3d at 869. Accordingly, this court will review the remaining claims raised by the petitioner under the standards of § 2254(d), as amended; that is, the court will independently determine whether the state court's decision on the merits of such claims is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States."

## IV. REQUEST FOR EVIDENTIARY HEARING AND EX PARTE MOTION FOR APPOINTMENT OF NEURO-PSYCHOLOGIST

The court must first address Burris's request for an evidentiary hearing and *ex parte* motion for the appointment of a neuropsychologist pursuant to 21 U.S.C. § 848(q)(9) and (10). The petitioner contends that since he is entitled to receive *de novo* review of his ineffective assistance of counsel claims, he should be allowed to further develop the facts underlying such claims. Thus, he seeks an evidentiary hearing on those claims in this court, to be held after a neuropsychologist is appointed to examine and test the petitioner to determine whether he suffers from brain dysfunction or other neurocognitive damage.

The State argues that the appointment of a neuropsychologist and the holding of an evidentiary hearing are unnecessary in this case. The respondent claims that such

events would only serve to further delay the imposition of Burris's ultimate sentence and, thus, are unnecessary to the resolution of the issues raised in this petition. The respondent argues that the appointment of investigative or expert assistance need not be made unless it is reasonably necessary for the representation of the petitioner. *See* 21 U.S.C. § 848(q)(9). In addition, under § 2254(e)(2) as amended by the AEDPA, the respondent contends that Burris is not entitled to an evidentiary hearing because he is unable to satisfy the statutory test. Even if the new statute is not applied, the State argues that an evidentiary hearing is unwarranted under pre-AEDPA standards.

### A. EVIDENTIARY HEARING

The court will first address Burris's request for an evidentiary hearing. Burris claims that he initially attempted to develop his facts concerning the ineffective assistance of counsel claims in the state courts. However, after filing his PCR petition on the second death sentence, the Supreme Court of Indiana summarily rejected the PCR petition, finding that it was a successive petition under Indiana Post–Conviction Rule 1 § 12. *See Burris v. State*, No. 49S00–9509–SD–1112, at 1–2 (Ind. Oct. 19, 1995). As a result, the petitioner alleges that the decision of the Supreme Court of Indiana made it impossible for him to adequately develop the factual basis of his ineffective assistance claims in the state courts. Therefore, under the principles of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the petitioner argues that he has met the necessary requirements to warrant holding an evidentiary hearing in order to develop the factual basis for his ineffective assistance claims.

### 1. Pre–AEDPA Standards

To fully analyze whether an evidentiary hearing is mandated in this case, it is necessary to address the petitioner's request under the applicable standards as they existed prior to the signing of the AEDPA on April 24, 1996, as well as the standards of § 2254(e)(2) as amended by the Act. In *Townsend v. Sain, supra*, the Supreme Court of the United States set forth with

particularity the standard a petitioner must fulfill to warrant the holding of an evidentiary hearing on a habeas corpus petition in federal court. The Court held:

> [A] federal court *must* grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend,* 372 U.S. at 313, 83 S.Ct. at 757 (emphasis supplied).

Following *Townsend,* the Supreme Court of the United States next addressed the issue of evidentiary hearings on habeas corpus petitions in *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). In *Keeney,* the Supreme Court did not alter the *Townsend* standard with regard to when an evidentiary hearing is mandated—the Court merely changed the standard that a petitioner must satisfy when the petitioner, himself, caused the failure to adequately develop the facts in the state court. *Id.* at 6, 112 S.Ct. at 1717–18. In a case where the failure to adequately develop the factual background rests at the petitioner's own doorstep, the Court in *Keeney* overruled *Townsend,* holding that a "cause and prejudice" standard should be applied rather than the "knowing waiver" or "deliberate bypass" standards set forth in *Townsend. Id.* at 7–8, 112 S.Ct. at 1718–19. However, in a case where the failure to adequately develop the facts in state court cannot be blamed on the petitioner, the *Townsend* factors are still the pre–AEDPA standard.

Applying the *Townsend* factors to this case, it appears that the petitioner can satisfy his burden which would mandate this court to hold the requested evidentiary hearing. Burris alleges that he did not receive a full and fair hearing in the state courts, and that the failure to develop the ineffective assistance claims in state court was not a result of his own negligence. Thus, it appears that Burris attempts to meet the *Townsend* test by pleading compliance with factor (3) (that the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing) and factor (6) (that for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing).

At the state court level, the Supreme Court of Indiana dismissed Burris's attempt to challenge the effectiveness of his sentencing and appellate counsel on his second death sentence without allowing for discovery or holding an evidentiary hearing. *See Burris v. State,* No. 49S00–9509–SD–1112, at 1–2 (Ind. Oct. 19, 1995). The Supreme Court of Indiana held that Burris had already challenged the sufficiency of the mitigating evidence presented in his second sentencing trial on direct appeal and during post-conviction review of his underlying conviction; therefore, a hearing on his ineffective assistance claims was unnecessary. *Id.*

The Seventh Circuit has held that upholding the failure of a state court to provide a petitioner with a full and fair hearing would reward that state court for its denial of due process. *See Bracy v. Gramley,* 81 F.3d 684, 693 (7th Cir.), *petition for cert. filed* (Sept. 23, 1996).[7] In this case, the court finds that the courts of the State of Indiana failed to provide Burris with a full and fair hearing on his ineffective assistance claims. Thus, under the pre-AEDPA standards of *Townsend* and *Keeney,* because the Supreme Court of Indiana dismissed Burris's PCR petition as successive without allowing for discovery, holding an evidentiary hearing or addressing the merits of Burris's ineffective assistance claims which were before the court in the first instance, it would appear that this court would be mandated to hold the requested evidentiary hearing.

---

**7.** It is important to note that the Seventh Circuit's decision in *Bracy* was released on April 12, 1996—almost two weeks *before* the AEDPA was signed into law.

### 2. Standards of Section 2254(e)(2) as amended by the AEDPA

With the passage of the AEDPA, the rules governing the holding of evidentiary hearings on habeas corpus petitions in the federal courts changed dramatically. Accordingly, this court must first address whether the petitioner's request for an evidentiary hearing should be addressed under the new standards of § 2254(e)(2). Second, if the new standards are applicable, this court must determine whether the petitioner can satisfy the new standards.

The AEDPA amended § 2254 in pertinent part as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The first question that must be answered is whether § 2254(e)(2), as amended, should apply to cases that were pending on the date the AEDPA was enacted. In *Lindh, supra,* the Seventh Circuit, in finding that § 2254(d) should be applied retroactively, implied that all of the amendments to § 2254 contained in § 104 of the AEDPA should apply to cases pending on the date of enactment. *Lindh,* 96 F.3d at 867. The court found that retroac-

tive application of the AEDPA does not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* However, because the Seventh Circuit did not explicitly hold that § 2254(e)(2) should be applied to cases pending on April 24, 1996, this court must analyze that section under the decision of the Supreme Court of the United States in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).[8]

In *Landgraf,* the Supreme Court set forth the sequence of issues that must be addressed to determine whether a newly enacted statute should be applied to cases which were pending on the date of enactment. First, it must be determined whether Congress has decided to which cases a new law applies; "if it has, the only task is to follow the statute." *Lindh,* 96 F.3d at 861. If Congress has not addressed that issue, then the court must apply the law in effect at the time of the decision—in this case § 2254(e)(2) as amended—unless "the new provision attaches new legal consequences to events completed before its enactment." *Id.* (quoting *Landgraf,* 511 U.S. at 269, 114 S.Ct. at 1499).

In *Landgraf,* the Supreme Court specifically addressed the issue of applying procedural rules to cases pending when a new statute is enacted:

Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity. For example, in *Ex Parte Collett,* 337 U.S. 55, 71, 69 S.Ct. 944, 952–53, 93 L.Ed. 1207 (1949), we held that 28 U.S.C. § 1404(a) governed the transfer of an action instituted prior to that statute's enactment. We noted the diminished reliance interests in matters of procedure. *Id.,* at 71, 69 S.Ct., at 952–53. Because rules of procedure regulate secondary rather than primary conduct, the fact that a new proce-

---

**8.** Although the parties did not specifically address the issue of retroactivity in relation to § 2254(e)(2) in their supplemental briefs, both parties did analyze the petitioner's request for an evidentiary hearing under § 2254(e)(2), as amended. Because the Seventh Circuit has not

specifically held that § 2254(e)(2) should be applied to cases pending on April 24, 1996, the court must determine whether applying the new standard is warranted or mandated through an analysis of that section under the holdings of *Landgraf.*

dural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive. *Cf. McBurney v. Carson,* 99 U.S. 567, 569, 25 L.Ed. 378 (1879).

511 U.S. at 275, 114 S.Ct. at 1502.

▌ The issue of procedural rules is relevant to the discussion of § 2254(e)(2) because it is well settled that the decision whether or not to hold an evidentiary hearing is an issue that is procedural rather than substantive in nature. *See Pittman v. Warden, Pontiac Correctional Ctr.,* 960 F.2d 688, 690 (7th Cir.) (finding that before beginning substantive analysis of petitioner's habeas petition, it was necessary for court to address the denial of petitioner's request for evidentiary hearing), *cert. denied,* 506 U.S. 880, 113 S.Ct. 229, 121 L.Ed.2d 165 (1992); *see also, Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago,* 834 F.2d 677, 683 (7th Cir.1987) (stating that issue of holding evidentiary hearing was included in a "variety of procedural rulings challenged"). Therefore, because the issue whether an evidentiary hearing should be held on a habeas petition is procedural in nature, application of the new § 2254(e)(2) will not attach any new legal consequences to this petition; for the decision to hold an evidentiary hearing will not, by itself, affect any of this court's legal conclusions with respect to the grounds for review presented in Burris's second habeas petition. As a result, following the Seventh Circuit's holding in *Lindh,* because the procedural decision whether or not to hold an evidentiary hearing under § 2254(e)(2) does not attach new legal consequences to events completed before its enactment, the court must apply the amended standards of § 2254(e)(2) to Burris's request for an evidentiary hearing rather than the pre-AEDPA *Townsend* standards.

With respect to his request for an evidentiary hearing under § 2254(e)(2), the petitioner argues that the new standards of § 2254(e)(2) are merely a codification of the decision of the Supreme Court of the United States in *Keeney v. Tamayo–Reyes, supra*— that an evidentiary hearing shall not be granted if the petitioner fails to develop the facts of his claim in the state court and fails to show cause and prejudice to excuse such failure. 504 U.S. at 8–11, 112 S.Ct. at 1719–21. In support of this contention, the petitioner cites to four unpublished United States District Court opinions. *See Silva v. Calderon,* No. CV 90–3311 DT (C.D.Cal. June 26, 1996); *Douglas v. Calderon,* No. CV 91–3055 RSWL (C.D.Cal. June 11, 1996); *Bean v. Calderon,* No. CIV S–90–0648 WBS/ GGH (E.D.Cal. May 15, 1996); *Wilkins v. Bowersox,* 933 F.Supp. 1496 (W.D.Mo.1996). Burris contends that since his own negligence was not the cause for the failure to develop the facts underlying his ineffective assistance claims in the state courts, the holding of *Keeney* does not apply and, consequently, § 2254(e)(2) should not control in this case.

After careful review of this argument, the court finds that it cannot agree with the petitioner's reading that § 2254(e)(2) is merely a codification of the Supreme Court's holding in *Keeney.* To identify the proper scope of § 2254(e)(2), it is necessary to analyze the wording of the statute itself. The section begins by stating, "[i]f the applicant has *failed to develop* the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless...." 28 U.S.C. § 2254(e)(2) (emphasis supplied). The court notes that this phrase can best be described as vague and unclear. However, the key to this section is how the phrase "the applicant has failed to develop" should be interpreted by this court.

The petitioner contends that the phrase "the applicant has failed to develop" is a merely a codification of *Keeney*—i.e., that the section applies *only* if the failure to develop facts in the state court was the *petitioner's fault.* However, this court reads the opening phrase of § 2254(e)(2) in accord with Magistrate Judge Hollows of the Eastern District of California, who stated "the 'fail to develop' language applies to *the non-development of any claim in state proceedings* regardless of the fault of the petitioner in not developing the claim which is then in turn subject to two stated exceptions." *Bean v. Calderon,* No. CIV S–90–0648 WBS/GGH, at 8 (E.D.Cal. May 15, 1996) (emphasis supplied).

**1326**

A review of § 2254(e)(2)(A) establishes that Congress intended to except from the mandate against holding an evidentiary hearing two scenarios: (i) where the claim is based on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; and (ii) where the petitioner could not have previously discovered the factual predicate of the claim through the exercise of due diligence. The latter scenario, thus, allows a petitioner to comply with § 2254(e)(2)(A) if the failure to develop the facts in the state courts was not due to *the petitioner's own negligence*. Accordingly, it would be incongruous to require a petitioner to demonstrate that the facts sought to be introduced at an evidentiary hearing could not have been obtained previously through the exercise of his own due diligence *if* the section applied only to those scenarios where the facts were not developed in the state court due to the petitioner's own negligence. As a result, the opening phrase must be read to include *any* non-development of the facts in the state court, for any other reading would make the second prong of § 2254(e)(2)(A) mere surplusage. Accordingly, the court finds that § 2254(e)(2) applies to the petitioner's request for an evidentiary hearing in this case.

### 3. Application of Section 2254(e)(2)

Following the plain meaning of the statute, this court is not to hold an evidentiary hearing unless Burris can meet the two-prong test of subsections (A) and (B). First, Burris must establish that the failure to develop facts in the state court was based upon either (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court of the United States, that was previously unavailable, or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence. In this case, it is clear that Burris can satisfy the second prong. As discussed above, Burris was not provided an opportunity to develop his ineffective assistance claims in the state court because the Supreme Court of Indiana "lumped" said claims together with his previous challenges to the sufficiency of the mitigation evidence presented.

Therefore, the court finds that Burris was diligent in his attempt to develop the facts underlying his ineffective assistance claims in the state courts, however, he was denied such an opportunity by the Supreme Court of Indiana.

Aside from showing cause for the failure to develop facts in the state court, Burris must also show "that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). A strict read of this subsection automatically precludes Burris from receiving an evidentiary hearing because Burris's guilt has already been conclusively determined in the state courts and through his first federal habeas petition. Thus, it would be impossible for Burris to establish that no reasonable factfinder would have found him guilty of the underlying offense; for it is undisputed that Burris is guilty of the underlying felony murder. Nevertheless, under the unusual circumstances of this case, it would be inequitable to apply a strict interpretation of this statute. Accordingly, it is this court's opinion that Burris must instead prove that the facts underlying his claims would be sufficient to establish by clear and convincing evidence that but for constitutional error— here, a Sixth Amendment violation—no reasonable factfinder would have *recommended the death penalty* for Burris in this case.

This court has before it the entire record of Burris's second sentencing trial—a record which consists of 2,440 pages of transcript in ten (10) separate volumes. In addition, the court has reviewed the exhibits filed by the petitioner, specifically the affidavits of several psychologists and one of the attorneys whose very effectiveness is challenged in this petition—R. Mark Inman—in which Inman explains the reasoning behind counsel's actions both in the sentencing trial and on appeal.

The Seventh Circuit has held that with regard to evidentiary hearings on habeas petitions, in-person testimony is unnecessary where the court has before it the affidavits of

probable witnesses because the affidavits represent the most favorable version of a petitioner's arguments. *See Kavanagh v. Berge,* 73 F.3d 733, 737 (7th Cir.1996). For these reasons, and the reasons set forth in Section V below, the court finds that Burris cannot establish that the facts underlying his ineffective assistance claims would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have recommended the death penalty. As a result, the court now denies Burris's request for an evidentiary hearing.

## B.  MOTION FOR APPOINTMENT OF NEUROPSYCHOLOGIST

The petitioner also has requested that the court appoint a neuropsychologist, pursuant to 21 U.S.C. § 848(q)(9), to examine Burris in order to fully develop the factual background of his ineffective assistance claims. Section 848(q)(9) states in relevant part:

Upon a finding that investigative, expert, or other services are *reasonably necessary for the representation of the defendant,* whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefore, under paragraph (10).

21 U.S.C. § 848(q)(9) (emphasis supplied).

The petitioner argues that the appointment of a neuropsychologist to examine and test him is necessary to determine whether he suffers from brain dysfunction or other neurocognitive defects. The court interprets Burris's ineffective assistance claims as alleging that counsel was ineffective because they failed to adequately investigate whether Burris *suffered* from brain dysfunction and to introduce evidence of brain dysfunction at the second sentencing trial. With regard to the allegation that counsel failed to introduce evidence, it does not appear that an expert is reasonably necessary since the

evidence must have already been in existence at the time of trial.

As for the claim that counsel failed to properly investigate the evidence, the question is not so much whether Burris actually suffers from brain dysfunction as it is whether counsel failed to properly investigate whether such evidence existed at the time of trial. Further, as stated above, this court found that Burris is not entitled to an evidentiary hearing on his ineffective assistance claims. In addition, the United States Court of Appeals for the Fourth Circuit has held that there is no need to appoint an expert under § 848(q)(9) if the petitioner's petition does not raise claims which entitle him to an evidentiary hearing at which the expert could present evidence on the petitioner's condition. *Lawson v. Dixon,* 3 F.3d 743, 752 (4th Cir.1993), *cert. denied,* 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 556 (1994).[9]  Therefore, the court finds that there is no "reasonable necessity" for the appointment of a neuropsychologist in this case. Consequently, the court will now address the merits of the claims raised in Burris's petition.

## V.  INEFFECTIVE ASSISTANCE OF SENTENCING COUNSEL

The grounds for review raised by Burris in this petition can be broken down into two groups: (1) those issues raised for the first time in his PCR petition; and (2) those issues raised on direct appeal of his second death sentence. The court will first address the issues raised initially in Burris's PCR petition. Burris first claims that his sentencing counsel—attorneys R. Mark Inman and Michael R. Fisher—failed to adequately investigate and introduce available mitigation evidence which counsel allegedly possessed at the time of the second sentencing trial, violating his rights under the Sixth Amendment to the United States Constitution.

Specifically, Burris alleges that his sentencing counsel were ineffective because they failed to fully investigate and adequately present the following evidence which the petitioner alleges would have established that

9.  While this court is not required to follow the appellate decisions of other circuits blindly, these decisions must be given due respect because the

Seventh Circuit has yet to rule on this issue. *See, Colby v. J.C. Penney Co., Inc.,* 811 F.2d 1119, 1123 (7th Cir.1987).

he suffers for brain dysfunction or other neurocognitive defect: (1) that Burris had been shot in the head in 1976; (2) that Burris suffered from severe migraine headaches, blackout spells, tinnitus, blurred vision and other visual disturbances; (3) that Burris's medical records indicated that he was given an EEG test prior to the sentencing trial, but that the results of said test had not yet been received by counsel; (4) that Burris was seen on September 7, 1977, for a neurological evaluation at Lake Shore Hospital while incarcerated at the Indiana State Prison; (5) that Burris was prescribed medication for his migraine headaches, which included such drugs as Sinequan, Haldol, Cogentin, Sansert, Cafergot and Percogesic; and (6) that Burris's medical records indicate that he was examined at Wishard Memorial Hospital in Indianapolis, Indiana. In addition, Burris claims that his sentencing counsel failed to introduce evidence that he was sexually abused as a child in support of his mitigation case.

The petitioner further contends that attorneys Inman and Fisher should have known about the evidence of brain dysfunction in light of the fact that they possessed Burris's medical records which contained the information at the time of the second sentencing trial. In support of this contention, Burris submits the sworn affidavit of his attorney Mark Inman, in which Inman admits that counsel possessed no strategy reason for not investigating and introducing evidence of brain dysfunction and sexual abuse during the second sentencing trial. Based upon such an alleged failure, Burris argues that his sentencing counsel were constitutionally ineffective under the Sixth Amendment.

The State argues that the allegation that counsel failed to properly investigate and introduce certain mitigation evidence fails for three reasons. First, the State contends that the theory of brain dysfunction was inconsistent with the mitigation evidence that counsel discovered and actually presented to the jury; thus, to suggest a brain disorder would have undermined the credibility of Burris's own witnesses. Second, the affidavits and records that Burris offers fall short of establishing that further investigation by counsel

would have uncovered that Burris actually suffers from organic brain dysfunction. Third, the State claims that the facts underlying the allegation of sexual abuse are at best speculative since they are only supported by Burris's own self-serving affidavit. Thus, even under *de novo* review, the State argues that counsel's performances during the second sentencing trial were not constitutionally deficient.

## A. STANDARDS OF REVIEW UNDER THE SIXTH AMENDMENT

The Sixth Amendment guarantees to criminal defendants the right to assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335, 339–40, 83 S.Ct. 792, 793–94, 9 L.Ed.2d 799 (1963). The Supreme Court of the United States has recognized that "the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis supplied). However, as the Supreme Court explained in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), whether counsel is effective or ineffective does not turn on a petitioner's subjective pleasure or displeasure with counsel's performance. The Court held that there are two essential elements to a successful claim of ineffective assistance of counsel under the Sixth Amendment:

*First, the [petitioner] must show that counsel's performance was deficient.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. *Second, the [petitioner] must show that the deficient performance prejudiced the defense.* This requires showing that counsel's errors were so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes *both* showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064 (emphasis supplied).

■ A petitioner is also entitled to the effective assistance of counsel at sentencing.

*Id.* at 690–91, 104 S.Ct. at 2065–67. Thus, counsel "must make a 'significant effort, based on reasonable investigation and logical argument,' to mitigate his client's punishment." *Stewart v. Gramley,* 74 F.3d 132, 135 (7th Cir.) (citing *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989)), *cert. denied,* —— U.S. ——, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996). Further, a claim of ineffective assistance of counsel at sentencing is reviewed under the same cause and prejudice standard as an ineffective assistance claim challenging representation in the guilt phase of a trial. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2065–67; *Gramley,* 74 F.3d at 135.

■ With regard to establishing cause, this court must apply the highly deferential standard of *Strickland* and must determine whether counsel's decisions, viewed from counsel's perspective at the time, might be considered sound trial strategy. *Kubat,* 867 F.2d at 359. "Even the best lawyer slips up from time to time ... On the spot, with limited time to explore options, counsel must do the best they can. Only 'errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment' " can establish deficient performance. *Burris v. Farley,* 51 F.3d 655, 661 (7th Cir.1995). In the sentencing context, "prejudice may exist when there is a reasonable probability that, absent the errors, the [sentencing authority] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Jones v. Page,* 76 F.3d 831, 846 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 363, 136 L.Ed.2d 254 (1996).

## B. COUNSEL'S PERFORMANCES

With these standards in mind, the court must first determine whether counsel's performances were objectively deficient under *Strickland* and its progeny. As a preliminary matter, the court must note that the State of Indiana has adopted standards for the appointment of qualified counsel in capital cases. Rule 24 of the Indiana Rules of Criminal Procedure sets forth the qualifications counsel must possess in order to become appointed counsel in a capital case.[10] It is undisputed in this case that all counsel who represented Burris during the second sentencing trial and on direct appeal of the second death sentence qualified for appointment under Indiana Criminal Rule 24. Therefore, it is proper to conclude that Burris's counsel as a whole had substantial experience in capital cases and with the requirements of presenting mitigation evidence on the petitioner's behalf.

Burris alleges that his sentencing counsel failed to adequately investigate and introduce certain mitigation evidence on his alleged suffering from brain dysfunction and his

---

**10.** Rule 24 of the Indiana Rules of Criminal Procedure states in relevant part:

(B) Appointment of Qualified Trial Counsel. Upon a finding of indigence, it shall be the duty of the judge presiding in a capital case to enter a written order specifically naming two (2) qualified attorneys to represent an individual in a trial proceeding where a death sentence is sought. The provisions for the appointment of counsel set forth in this section do not apply in cases wherein counsel is employed at the expense of the defendant.

  (1) Lead Counsel; Qualifications. One (1) of the attorneys appointed by the court shall be designated as lead counsel. To be eligible to serve as lead counsel, an attorney shall:

    (a) be an experienced and active trial practitioner with at least five (5) years of criminal litigation experience;

    (b) have prior experience as lead or co-counsel in no fewer than five (5) felony jury trials which were tried to completion;

    (c) have prior experience as lead or co-counsel in at least one (1) case in which the death penalty was sought; and

    (d) have completed within two (2) years prior to appointment at least twelve (12) hours of training in the defense of capital cases in a course approved by the Indiana Public Defender Commission.

  (2) Co-Counsel, Qualifications. The remaining attorney shall be designated as co-counsel. To be eligible to serve as co-counsel, an attorney shall:

    (a) be an experienced and active trial practitioner with at least three (3) years of criminal litigation experience;

    (b) have prior experience as lead or co-counsel in no fewer than three (3) felony jury trials which were tried to completion; and

    (c) have completed within two (2) years prior to appointment at least twelve (12) hours of training in the defense of capital cases in a course approved by the Indiana Public Defender Commission.

childhood sexual abuse. However, it is important to note that this is not a case where counsel failed to present *any* evidence of mitigation. *See Emerson v. Gramley*, 91 F.3d 898 (7th Cir.1996). It is undisputed that Burris's counsel indeed presented substantial mitigation evidence on Burris's behalf in the second sentencing trial. Burris's sentencing counsel presented the following mitigation case: (1) that Burris led a depraved childhood; (2) that he was used as a "gofer" in a house of prostitution during his pre-teen years; (3) that he was troubled because he did not know his true parentage or even his true age; (4) that he had been raised in a neighborhood with no programs for youth; and (5) that he had a very good record of behavior in prison since his incarceration. The presentation of such evidence even proved successful in part—the jury which heard the evidence was unable to make a unanimous recommendation on whether Burris deserved the death penalty for his crimes.

Burris now attempts to question his sentencing counsel's strategy by asserting that additional mitigation evidence should have been investigated and introduced. In support of this argument, the petitioner has submitted the affidavits of attorney Inman and psychologists Richard Loughead, Ph.D., and Michael Gelbort, Ph.D., to suggest that he *may* suffer from a neurocognitive defect, as well as Burris's own affidavit in support of the claim that he was sexually abused as a child.

In his sworn affidavit, Mr. Inman states that counsel did not have a strategy reason for failing to introduce the mitigation evidence at issue, even though he and his co-counsel Michael Fisher possessed such information at the time of trial. Further, Inman asserts that counsel did not investigate or request certain of Burris's medical records from Wishard Memorial Hospital; did not request the results of Burris's EEG; did not speak to the physicians who examined Burris concerning any diagnosis; and did not investigate any other facts relating to Burris's medical records. Inman also admits that counsel did not give the above-referenced medical records to Dr. Loughead, the psychologist who testified on behalf of Burris in the second sentencing trial, and that counsel did not give the records to or consult with any other expert concerning the applicability of said records. With respect to the childhood sexual abuse evidence, Inman states that counsel did not ask Burris about any of his hospitalizations during his childhood, and that counsel did not know that Burris was treated for a sexually transmitted disease when he was only ten years of age.

Dr. Richard Loughead states under oath that prior to giving his testimony in the second sentencing trial, he requested to review any medical records that Burris's sentencing counsel possessed. However, he states that he was informed by attorney Fisher that counsel did not have any of Burris's medical records. Further, Dr. Loughead states that if he had possessed the information contained in the medical records, he would have had justification for subjecting Burris to further testing to assess any brain damage or dysfunction, and would have referred Burris for neuropsychological testing. Moreover, he asserts that knowledge of such evidence would have altered the testimony he presented in the second sentencing trial.

Dr. Michael Gelbort states under oath that he is a clinical psychologist with advanced training in neuropsychology. Dr. Gelbort asserts that he believes, in light of the evidence, that since Burris suffered from migraine headaches; that Burris had been shot in the head; and that Burris suffered from various visual disturbances; the possibility exists that Burris suffers from brain dysfunction or damage and neurocognitive defects.

The petitioner, himself, states under oath that as a young child he lived in a household with prostitutes. Burris also states that he was sexually abused by some of the prostitutes with whom he lived. Additionally, he alleges that he was diagnosed as having a sexually transmitted disease when he was only ten years old.

■ The petitioner contends that counsel's failure to adequately research and present such evidence of *possible* brain dysfunction and childhood sexual abuse amounts to a violation of the Sixth Amendment to the United States Constitution. However, in this

court's view, notwithstanding attorney Inman's assertion that counsel did not have a strategy reason for their decision not to present the brain dysfunction and sexual abuse evidence, the performances of Burris's counsel were not constitutionally deficient in the second sentencing trial.

First, the court finds that the theory of brain dysfunction is inconsistent with the mitigation evidence counsel actually discovered and presented to the state trial court and the jury. During the second sentencing trial, the defense called several witnesses in an attempt to humanize Burris and show how well he had adjusted to prison life. One such witness was Teresa Harper, one of Burris's previous attorneys. During her direct examination, she testified that "Gary [Burris] has always been a pretty bright individual and I've seen him, I think, mature and become even more mature and stable in his prison adjustment." Tr.–II at 2084.[11] In response to a question asking her to describe Burris as a human being, Harper answered, "He's bright and he's sensitive. We can talk about everything from the civil rights movement in 1965 and Thurgood Marshall to Star Trek." Tr.–II at 2085.

Another witness called by the defense was Terry Dunlap. Mr. Dunlap is a correctional sergeant at the Indiana State Prison who was assigned to guard the inmates on death row at the prison. During his testimony on direct examination, he described Burris as follows:

> [Burris] did a lot of reading, a lot of studying. He did a lot of helping with some of the other fellows. A lot of them depended on him to help them through. Well, keep in mind, we had a lot of undereducated guys and Gary did have that nack [sic] of taking up with them and trying to help them out.

Tr.–II at 2119. On cross-examination, Dunlap testified in part as follows:

Q. Did Gary Burris seem like a bright individual to you on the unit?

A. Yes, he did.

Q. And he paid a lot of attention then to legal issues, is that correct?

A. Yes.

Tr.–II at 2122.

Sentencing counsel also called Bernard Nathaniel Johnson, a correctional officer as well as a case manager for the segregation units at the Indiana State Prison, as a witness in their attempt to portray Burris as an intelligent and well-adjusted prisoner. On direct examination, Johnson was asked the following questions:

Q. Do you feel Gary is very responsible?

A. Yes.

Q. Do you view Gary as someone who other inmates listen to?

A. Yeah. I think he had his—I think he was in a power position.

Q. What do you mean by a power position?

A. Well, I think he was the type of person that the other guys looked up to him. Do you know what I'm saying? That you know, we had what they call followers and leaders. I think [Burris] was a leader.

Tr.–II at 2133. Later on direct examination, Johnson testified: "[Burris] was one of the most well versed, what we call jail house lawyers, in that unit. When guys had a case to be worked on they would want to see him about helping them out." Tr.–II at 2135.

The testimony of Ms. Harper, Officer Dunlap and Officer Johnson provided substantial evidence that Burris was regarded by those who knew him as intelligent, a leader on death row, and one of the most well-versed "jail house lawyers" in the unit. Such evidence can be highlighted by Burris's actual performance as a "jail house lawyer." The court takes judicial notice of one of several civil rights suits filed by Burris in this court in the 1980's.

In *Burris v. Kirkpatrick,* Burris, acting *pro se,* brought an action under 42 U.S.C. § 1983 against a prison guard alleging an Eighth Amendment violation for injuries sustained when the guard threw hot water into

---

**11.** For the sake of clarity, the court will refer to the transcript of the first trial as "Tr.–I" and the transcript of the second sentencing trial as "Tr.–II."

Burris's cell. See *Burris v. Kirkpatrick,* 573 F.Supp. 1084 (N.D.Ind.1983), and *Burris v. Kirkpatrick,* 649 F.Supp. 740 (N.D.Ind.1986). After proceeding to a bench trial before this court, judgment was entered in Burris's favor in the sum of one hundred dollars ($100.00). While this court claims no expertise in the area of neuropsychology, it is the court's reasoned opinion that in light of Burris's performance in that action, the briefs filed by the petitioner and the petitioner's demeanor in court, Burris does not appear to be someone who suffers from brain dysfunction or damage.[12]

After reviewing the totality of the state court record in this case, the court hereby finds that the testimony of Ms. Harper, and Officers Dunlap and Johnson would have been directly undermined by the proposed introduction of evidence alleging that Burris suffers from brain dysfunction or damage. Thus, based upon the foregoing evidence, this court cannot find that counsel's decision not to investigate and introduce evidence of brain dysfunction was unreasonable under *Strickland.*

Second, the court finds that the theory of brain dysfunction is inconsistent with the facts of the crime itself. Taking the facts as found by the courts of the State of Indiana as true, *see* 28 U.S.C. § 2254(e)(1), a summary of the facts underlying Burris's crimes is in order. In January 1980, Burris was in need of money to pay his bills. In order to get the money he needed, Burris and his companions, with Burris as the leader and mastermind, decided to call a cab, rob the driver and, no matter who the driver was, kill him. Thus, on January 29, 1980, Burris had a barmaid at the M & J Social Club call the cab company and request a taxi. When the taxi arrived, Burris and his companions entered the cab. After directing the driver where to go, Burris and his friends announced their intentions. They directed the driver to stop near an alley, required him to remove all of his clothing, took him into the alley, made him lie face down on the ground,

and tied his hands behind him. Burris then placed the barrel of his pistol flush against the victim's head and shot him. The taxi itself was left near the scene, and Burris later flushed the driver's run sheet down his toilet in an effort to eliminate evidence. The pistol was subsequently found hidden in a stereo speaker in the apartment of Burris's friend. Burris later stated that he executed the driver, according to his plan, in order to eliminate any witnesses to the crime and to avoid a return trip to prison.

Burris murdered Kenneth Chambers according to a cold-blooded, calculated plan. It is this court's view that someone who suffers from a brain dysfunction would not be able to plan such a heinous crime, much less carry it out in such a calculated fashion, eliminating and hiding evidence after the fact. Thus, based upon the fact that the proposed evidence of brain dysfunction contradicts the very facts of the crime itself, and because such evidence would serve only to undermine much of the mitigation evidence actually offered by counsel, this court cannot find that counsel's performance, when viewed in its totality, was constitutionally deficient.

■ Third, the court finds that counsel's failure to investigate and introduce evidence that Burris was sexually abused as a child does not constitute ineffective assistance under the Sixth Amendment. In the second sentencing trial, counsel called several witnesses who testified that Burris grew up in the most unkind of environments. Ms. Jomarba Bell testified that the location where Burris grew up, the M & J Social Club, was known as a notorious house of prostitution and drug activity. Tr.–II at 2110–2114. Ms. Gwendolyn Reynolds, who worked as a cook at the M & J Social Club when Burris was a child, testified that Burris actively participated in the prostitution enterprises and drug trafficking that occurred while he lived at the M & J Social Club. Tr.–II at 2030–2039. Ms. Delma Edmondson testified that Burris was frequently in trouble with the police during

12. The court does not base its decision that Burris's sentencing counsel were not ineffective under the Sixth Amendment on his performance as a *pro se* litigant in an unrelated case. However, it is this court's view that Burris's success as a *pro se* litigant is relevant to any discussion of Burris's abilities and whether or not he suffers from brain dysfunction or other neurocognitive defects.

his childhood and that he did not even know who his parents were or when he was born. Tr.–II at 2053–2062. Ms. Edmondson further testified to rumors that Burris had been found in a trash can when he was a baby. Tr.–II at 2056. Even Dr. Loughead, when asked to characterize Burris's childhood, testified that "it was marked by physical violence ... physical, emotional abuse of the most severe kind." Tr.–II at 2170.

Based upon the presentation of such evidence, it is this court's view that the presentation of Burris's alleged sexual abuse and sexually transmitted disease would have been cumulative to the testimony of the witnesses actually called by his sentencing counsel. Further, Mr. Inman admits in his sworn statement that he did not even have knowledge of such evidence at the time of the second sentencing trial. It is this court's opinion that if such evidence was so critical, Burris would have informed his counsel of its existence before trial. Therefore, the court finds that counsel's performances cannot be found to be deficient because specific evidence of Burris's alleged childhood sexual abuse was not presented at trial.

The court acknowledges Mr. Inman's sworn statement in which he asserts that counsel did not have a strategic reason for not investigating and introducing the evidence of possible brain dysfunction and sexual abuse. However, "when the only record on which a claim of ineffective assistance is based is the trial record, every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." *United States v. Penass*, 997 F.2d 1227, 1229 (7th Cir.) (quoting *United States v. Taglia*, 922 F.2d 413, 417–18 (7th Cir.), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991)), *cert. denied*, 510 U.S. 971, 114 S.Ct. 458, 126 L.Ed.2d 390 (1993). A defense attorney in a criminal trial is often called upon to make many difficult choices among a number of legitimate options, and the *Strickland* test is "highly deferential" to the decisions of trial attorneys. *Swofford v. Detella*, 101 F.3d 1218, 1221–22 (7th Cir.1996).

In this case, it appears that counsel chose the avenue of attempting to humanize Burris by highlighting his intelligence and adjustment to prison life rather than painting Burris as a dysfunctional human being—a decision that met with reasonable success. Further, counsel presented ample evidence to support their claim that Burris grew up in a deprived and violent environment.

The Supreme Court of the United States recognized in *Strickland* that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." 466 U.S. at 689, 104 S.Ct. at 2065. Only if the act or omission is outside the wide range of professionally competent assistance will it be deemed unreasonable. *Id.* at 690, 104 S.Ct. at 2065–66. Upon review of the totality of counsel's performances in the second sentencing trial, this court finds that counsel's decision not to investigate and present evidence that Burris allegedly suffers from brain dysfunction or damage and neurocognitive defects, or that he was sexually abused as a child, was not unreasonable or outside the wide-range of acceptable professional decision-making. Therefore, the court holds that the petitioner cannot meet his burden under the first prong of the *Strickland* test.

## C. PREJUDICIAL EFFECT

Assuming for the sake of argument that counsel's performances could be deemed constitutionally deficient, the court also finds that counsel's performances were not prejudicial. In order to establish prejudice, Burris must not only show that there is a reasonable probability that, absent the errors, the second jury would have unanimously concluded that the balance of aggravating and mitigating circumstances did not warrant a recommendation of the death penalty, but also that Judge Gifford would have in fact found such a unanimous recommendation to be reasonable and, thus, would not have imposed a death sentence. *See Jones v. Page*, 76 F.3d at 846. As outlined above, Burris's sentencing counsel did present substantial mitigation evidence which in fact convinced at least one juror to find that a death sentence should not be recommended.

■ The Seventh Circuit recently held in *Eddmonds v. Peters,* 93 F.3d 1307 (7th Cir. 1996), that "[t]he purpose of mitigation is to reveal something that 'goes to show that [the petitioner] is not as "bad" a person as one might have thought from the evidence in the guilt phase of the proceeding.'" 93 F.3d at 1321 (quoting *Stewart v. Gramley,* 74 F.3d at 136). In this case, Burris's sentencing counsel made the conscious decision to attempt to humanize Burris through evidence of his deprived childhood and successful adaptation to prison life. Through the testimony of witnesses Harper, Dunlap and Johnson, sentencing counsel established that Burris was a bright, intelligent individual who was well-versed in the law and a leader on death row. It is this court's view that the presentation of evidence that Burris suffers from brain dysfunction or that he was sexually abused as a child would not have made a difference in the sentence he ultimately received.

First, the court agrees with the respondent's assertion that the affidavits and records offered by Burris fall short of establishing that further investigation by counsel *would* have revealed that Burris actually suffers from a neurocognitive disorder. The affidavit of Dr. Gelbort does not allege that he has ever examined Burris, much less that he and Burris have even met. Thus, any suggestion that Burris's gunshot wound and physical symptoms display effects resembling brain dysfunction are only a *possibility*—and a possibility of neurocognitive disorder is not enough to establish prejudice in this case.

Dr. Loughead states in his affidavit that after reviewing Burris's medical records, he would have had justification for subjecting Burris to further testing to assess brain damage or dysfunction. However, a review of the state court record also shows that as early as 1981, Burris was examined by two different psychiatrists, Dr. Ronald H. Hull and Dr. Dwight W. Schuster. Both Dr. Hull and Dr. Schuster described Burris's gunshot wound as "superficial" and found "no indications of mental illness or deficiency in [Burris's] history or these examinations." Tr.–I at 244. Further, the presentence report from Burris's first trial also acknowledged Burris's gunshot wound, but found that Bur-

ris reported no problems other than his migraine headaches. Tr.–I at 237. Thus, it is this court's view that Dr. Loughead's opinions are countered by substantial evidence that Burris did not suffer from any neurocognitive effects and that the presentation of such opinions would not have served to change the jury's decision to a unanimous recommendation against the death penalty or Judge Gifford's decision to impose death as Burris's ultimate sentence. As a result, the court holds that the failure to further test Burris for neurocognitive defects did not prejudice his sentencing in this case.

Second, the court finds that any evidence of brain dysfunction would only serve to undermine the substantial mitigation evidence presented by counsel in the second sentencing trial. The court again acknowledges Mr. Inman's sworn statement that counsel did not have a strategic reason for not investigating and introducing evidence of brain dysfunction or childhood sexual abuse. However, it cannot be disputed that the introduction of the brain dysfunction evidence would have contradicted much of the testimony of witnesses Harper, Dunlap and Johnson that counsel had already presented. Thus, because the mitigation evidence that was partially successful would have been contradicted by any evidence of brain dysfunction, it is this court's view that the balance between mitigating and aggravating evidence would not have shifted if sentencing counsel would have offered the evidence of alleged brain dysfunction. In actuality, the balance could have even shifted further toward the alleged aggravating circumstance because the mitigation evidence was self-contradictory. Therefore, counsel's decision not to investigate and introduce evidence of brain dysfunction did not prejudice the petitioner in his second sentencing trial.

■ As for the claim that counsel should have introduced evidence that Burris was sexually abused as a child, the court finds that such additional evidence clearly would not have affected Burris's ultimate sentence. Sentencing counsel presented several witnesses, including Dr. Loughead, who testified to the deprived and violent environment that Burris faced as a child. The court is uncon-

vinced that any additional evidence of sexual abuse, specifically that Burris was treated for a sexually transmitted disease at the age of ten or that he was sexually abused by the prostitutes with whom he lived, would tip the balance in favor of a unanimous recommendation by the second sentencing jury and a final determination against the death penalty by the state trial court. Therefore, the court finds that counsel's decision not to investigate and introduce specific evidence of childhood sexual abuse did not prejudice Burris during sentencing. As a result, this court holds that the overall performance of attorneys Inman and Fisher did not prejudice Burris in his second sentencing trial.

For the foregoing reasons, the court now holds that Burris cannot establish that his sentencing counsel were constitutionally ineffective when they decided not to introduce evidence of the petitioner's alleged brain dysfunction or childhood sexual abuse. Further, Burris cannot prove that counsel's performances, if deficient, prejudiced his defense. Therefore, the court must dismiss the petitioner's claim that sentencing counsel were ineffective when they decided not to investigate and introduce evidence of brain dysfunction or that the petitioner was sexually abused as a child.

## VI. INEFFECTIVE ASSISTANCE OF SENTENCING AND APPELLATE COUNSEL

Burris also challenges the effectiveness of his sentencing and appellate counsel by raising six individual instances in which he contends that his sentencing counsel failed to object to and preserve for appeal certain court decisions and evidence during the sentencing trial, and that appellate counsel failed to present on direct appeal certain grounds for review. Burris first claims that counsel failed to object to, preserve for and present on appeal the ground that the prosecutor's reading of an excerpt from the decision of the Supreme Court of the United States in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)—in which the prosecutor misidentified aspects of the decision—violated his right to a fair trial. Second, he contends that counsel failed to object

to, preserve for and present on appeal the fact that the prosecutor introduced into evidence a photograph of the victim in his United States Navy uniform. Third, he alleges that counsel failed to object to, preserve for and present on appeal the ground that the prosecutor brought out evidence that Emmet Merriweather, an accomplice to the felony murder of Kenneth Chambers, was out on parole for his role in the crimes.

Fourth, Burris argues that counsel failed to object during the second sentencing trial to the state trial court's decision not to allow sentencing counsel to present mitigation evidence that Burris blamed himself for the death of the woman who had given him primary care during his pre-teen years. Fifth, he claims that counsel failed to preserve for and present on appeal the claim that the state trial court violated Burris's Eighth and Fourteenth Amendment rights in sentencing him to death without considering and weighing as a mitigating circumstance the jury's inability to reach a sentencing recommendation. Sixth, he contends that counsel failed to preserve for and present on appeal the issue whether he was denied his rights under the Equal Protection Clause of the Fourteenth Amendment when the state trial court did not allow the jury to have any role in sentencing after the jury was unable to agree unanimously on a sentencing recommendation.

Additionally, Burris argues that but for the cumulative effect of his sentencing and appellate counsel's errors, the jury would have returned a unanimous recommendation that he not be sentenced to death and that the state court judge, thus, would not have imposed a death sentence. On the other hand, the State argues that the performances of Burris's sentencing and appellate counsel were not deficient under the Sixth Amendment.

Initially, this court must determine whether Burris has sufficiently identified the specific acts or omissions of his counsel which demonstrate that his attorneys' performances fell below an objective standard of reasonableness. *United States v. Penass*, 997 F.2d at 1229. Once such a determination is made, this court must review such ineffec-

tive assistance claims under the two-prong test set forth by the Supreme Court of the United States in *Strickland v. Washington, supra.* To establish ineffective assistance during the sentencing proceedings, Burris must demonstrate not only that counsel's performances were deficient, *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, but also that counsel's performances were prejudicial. *Id.* at 695, 104 S.Ct. at 2068–69.

When claims of ineffective assistance of counsel are also based on the failure to raise viable issues on appeal, the court must examine the state court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. *Mason v. Hanks,* 97 F.3d 887, 893 (7th Cir. 1996) (citing *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986)). Significant issues that could have been raised should then be compared to those issues actually raised on appeal; "generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* Put another way, the Seventh Circuit has held that when appellate counsel omits a claim that is a "dead-bang winner," ineffective assistance of counsel should result. *Bond v. United States,* 1 F.3d 631, 635 (7th Cir.1993).

Because the petitioner has identified the errors and omissions he contends demonstrate that his attorneys' performances fell below an objective standard of reasonableness, it is incumbent upon the court to determine whether counsel's performances were in fact deficient and, if they were, whether such performances actually prejudiced the petitioner by affecting the determination of his ultimate sentence. Since the performances of sentencing and appellate counsel on said claims are intertwined, the court will address the propriety of their performances together.

## A. PROSECUTOR'S STATEMENT DURING CLOSING ARGUMENTS

The first error alleged involves the failure of Burris's sentencing counsel to object to during trial, and the failure of appellate counsel to present on appeal, the issue that the prosecutor's misreading of an excerpt from the decision of the Supreme Court of the United States in *Skipper v. South Carolina, supra,* violated Burris's right to a fair trial under the Fourteenth Amendment to the United States Constitution. During the rebuttal portion of the prosecutor's closing argument, the prosecutor, Barbara Trathen, questioned the mitigation evidence presented by sentencing counsel relating to Burris's successful adjustment to prison life. Ms. Trathen described the decision in *Skipper* as the case authority that allowed the petitioner to present evidence that he had become well-adjusted to his prison environment. Specifically, Ms. Trathen stated:

> After today's decision competent defense counsel in capital cases will instruct their clients to behave like Eagle Scouts while awaiting trial, and particularly while awaiting sentencing. In capital cases, this will be more important to a defendant than the customary advice of counsel in a criminal trial to advise his client to behave himself while in the courtroom. It is indeed novel doctrine that compliance with this advice by a defendant charged with capital murder becomes a "mitigating factor" that the sentencing judge or jury must—as a matter of constitutional law—consider in passing sentence.

Tr.–II at 2347–48 (quoting *Skipper,* 476 U.S. at 14 n. 3, 106 S.Ct. at 1676 n. 3 (Powell, J., concurring)).

The prosecutor attributed this quote to the concurring opinion of then Chief Justice Burger in *Skipper.* However, the prosecutor was incorrect; the statement was actually written by Justice Powell in his concurring opinion—an opinion in which then Chief Justice Burger and present Chief Justice Rehnquist joined.

. The petitioner submits that the prosecutor's misidentification of the quote amounts to an issue of prosecutorial misconduct that should have been objected to at trial and presented on appeal. Specifically, Burris claims that the prosecutor's statement improperly negated an important part of the mitigation evidence presented and, thus, would have amounted to a reversible error on appeal. Burris cites to the decision of the

Supreme Court of Indiana in *Miller v. State*, 623 N.E.2d 403 (Ind.1993), which held that it is inappropriate for a prosecutor to read from a dissenting opinion during closing arguments. 623 N.E.2d at 408. Burris argues that there is a reasonable probability that untainted *Skipper* evidence would have persuaded the jury to return a unanimous recommendation that he not receive the death penalty. In support of this claim, the petitioner cites to the sworn affidavit of attorney Inman, in which Inman asserts that counsel did not have a strategy reason for failing to object to the evidence at trial or for failing to present the claim on appeal.

The State argues that it is far from clear whether the prosecutor's statement was even objectionable, much less so clearly objectionable that counsel's failure to object amounted to ineffective assistance of counsel. Further, the State contends that no federal violation arises from reading a concurring opinion to a jury or from inadvertently misidentifying the true author of an opinion of the Court.

▮▮▮ After reviewing the prosecutor's statement in light of the totality of the record, the court finds that counsel's failure to object to the statement was not erroneous. In *United States v. Penass, supra*, the Seventh Circuit held that the failure of trial counsel to make a contemporaneous objection to a prosecutor's remark during closing argument triggers a review for plain error. 997 F.2d at 1230. Thus, a court should only strike down a conviction based upon such a claim if "a miscarriage of justice would otherwise result." *United States v. Hernandez*, 865 F.2d 925, 928 (7th Cir.1989).

The court finds that sentencing counsel's failure to object to the prosecutor's misidentification of the true author of the *Skipper* quote can hardly be found to constitute reversible error. Indeed, it qualifies as harmless error at best. First, the prosecutor did not misstate the *Skipper* concurrence; she merely misidentified the true author of the

concurring opinion. Second, it is important to note that the statement was made during closing arguments. In her preliminary instructions to the jury, Judge Gifford instructed the jurors that "[a]ny comments or remarks by the court, or by counsel, *including the opening and closing arguments of counsel*, should not be considered as evidence in this case." Tr.–II at 170 (emphasis supplied). Judge Gifford further instructed the jury during final instructions that, "[i]n considering whether any mitigating circumstances exist you may consider all of the evidence introduced during these proceedings, regardless of who introduced such evidence." Tr.–II at 192.

The jury was instructed not to consider as evidence any statements made by either defense counsel or the prosecutor during closing arguments. Thus, Burris's suggestion that the prosecutor's statement improperly negated an important part of his mitigation case fails because the jury was specifically instructed not to treat such a statement as evidence. As a result, pursuant to the state trial court's instructions, the jury could not have used the prosecutor's statement to negate any mitigation evidence presented by Burris's counsel. Therefore, the court finds that counsel did not err when they failed to object to or present on appeal the ground that the prosecutor's misstatement of Justice Powell's concurrence in *Skipper* amounted to an issue of prosecutorial misconduct and, thus, that no miscarriage of justice occurred. Consequently, Burris cannot establish that counsel's performances were constitutionally deficient.[13]

## B. PHOTOGRAPH OF THE VICTIM

Burris next alleges that his sentencing and appellate counsel erred by failing to object to and present on appeal the fact that the prosecutor introduced into evidence a photograph of the victim wearing his United States Navy uniform. During the second sentencing trial, a picture of the victim in a Navy uniform was

---

**13.** The court need not address the prejudice prong of *Strickland* because the petitioner has failed to establish that counsel's performance with relation to this claim was constitutionally deficient. *See United States ex rel. Cross v. De Robertis*, 811 F.2d 1008, 1013–14 (7th Cir.1987)

(holding that a reviewing court need not address two *Strickland* prongs in any particular order or even address both if petitioner makes an inadequate showing as to one, citing *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069–70).

offered into evidence through the testimony of the victim's mother. Tr.–II at 2001. The petitioner contends that the photograph was totally irrelevant to the case and tampered in an arbitrary and capricious manner with the jury's obligation to decide whether or not to recommend the death penalty. Again, the petitioner offers Mr. Inman's sworn affidavit for support, as Inman asserts that counsel had no strategy reason for failing to object to the photograph when it was offered or for failing to present the issue on direct appeal.

The State argues that this claim is without merit because it is unclear whether such evidence was even objectionable. Further, the State submits that when Burris was re-sentenced in November 1991, his attorney could reasonably have believed that the photo constituted victim impact evidence that was admissible under *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)—a case that had been decided approximately five months before the resentencing. Consequently, the State submits that the admission of the photograph did not render the second sentencing trial unreliable or unfair.

■■■■ This court finds that counsel did not err in failing to object to or present on appeal the issue that the introduction of the victim's photograph was prejudicial. First, the court agrees with the respondent's contention that counsel could have reasonably believed that the photograph constituted the type of victim impact evidence which the Supreme Court held admissible in *Payne v. Tennessee, supra.* In *Payne,* the Supreme Court held that a State may properly conclude that in order for a jury to assess meaningfully the defendant's moral culpability and blameworthiness, a state trial court should have before it, at the sentencing phase, evidence of the specific harm caused by the defendant. 501 U.S. at 825, 111 S.Ct. at 2608. The Court found that "[t]he state has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer

that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.* Because the photo was offered during the testimony of the victim's mother, it is reasonable to assume that counsel could have believed that the photo constituted some form of admissible victim impact evidence.[14]

Further, in *United States v. Joe,* 8 F.3d 1488 (10th Cir.1993), *cert. denied,* 510 U.S. 1184, 114 S.Ct. 1236, 127 L.Ed.2d 579 (1994), the United States Court of Appeals for the Tenth Circuit held that photographs of homicide victims are relevant evidence to establish the identity of a victim. 8 F.3d at 1499 (citing with agreement *United States v. De Parias,* 805 F.2d 1447, 1453 (11th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987)).[15] Closer to home, in *Averhart v. State,* 614 N.E.2d 924 (Ind.1993), the Supreme Court of Indiana held that the introduction of a photograph of the victim with his granddaughter, which defense counsel did not object to, did not rise to the level of a fundamental error and did not demonstrate that trial counsel failed to render adequate representation during the trial. 614 N.E.2d at 927. Based upon these holdings, in conjunction with the Supreme Court's holding in *Payne, supra,* the court finds that counsel's failure to object to the introduction of the victim's photograph and present said issue on appeal was not error, and cannot be used as a basis to find that counsel rendered ineffective performances in the second sentencing trial or on appeal. Therefore, this claim must be dismissed.

## C. PAROLE STATUS OF PETITIONER'S ACCOMPLICE

The petitioner also claims that his sentencing and appellate counsel were constitutionally ineffective because they failed to object to

---

**14.** It is important to note that the petitioner also challenges the constitutionality of the state trial court's decision to allow the testimony of the victim's mother as inadmissible victim impact evidence. The court will address the merits of that issue in full in Section VII, *infra.*

**15.** *See Colby v. J.C. Penney Co., Inc.,* 811 F.2d at 1123, *supra* note 9.

and present on appeal the ground that the prosecutor improperly brought out evidence that Emmet Merriweather, one of Burris's accomplices, was out on parole for his role in the felony murder of Kenneth Chambers. In support of this contention, the petitioner again offers Mr. Inman's sworn affidavit, in which he states that counsel did not have a strategy reason for failing to object to such evidence. The State counters by arguing that the petitioner fails to identify any specific prejudice or resulting harm from the introduction of evidence that Merriweather was out of prison and on parole.

The basis for this claim occurred during the direct examination of witness Carol Wilkins. Ms. Wilkins was Emmet Merriweather's girlfriend at the time of the crimes in January 1980, and her sister, Debra Wilkins, was Burris's then girlfriend at that time. Tr.–II at 1902–03. During the State's case-in-chief, Ms. Wilkins answered the following questions:

Q. Have you had any regular contact or any real contact at all with Emmet Merriweather since 1980?

A. Well, I seen him when he was paroled. I seen him two or three times when he was paroled.

Q. Do you have any continuing relationship or any relationship whatsoever with Emmet Merriweather?

A. No.

Tr.–II at 1925–26.

A review of Ms. Wilkins' entire testimony leads the court to find that the prosecutor, by inquiring whether Wilkins had any present relationship with Merriweather, was merely attempting to suggest that Wilkins was not testifying against Burris in order to aid her old boyfriend, Merriweather. In fact, Wilkins' answers may very well have worked against the State; the testimony that Merriweather was out on parole for his role in the felony murder could well have substantiated a defense theory that the jury should not recommend the death penalty since one of the other individuals responsible for the felony murder was already out of jail.

Overall, the court finds the statements made by Ms. Wilkins to be rather benign in light of the totality of the record. Therefore, the court holds Burris cannot meet the first prong of the *Strickland* test because his sentencing and appellate counsel did not err when they failed to object to and present on appeal the propriety of the statements that Burris's accomplice was out on parole.

## D. STATE COURT'S DECISION NOT TO ALLOW EVIDENCE OF PETITIONER'S SELF–BLAME

Next, Burris challenges his sentencing counsel's performances by alleging that counsel were ineffective because they did not object to the state trial court's decision not to allow the presentation of certain mitigation evidence. Specifically, the petitioner claims that counsel failed to object when the state trial court excluded evidence that the petitioner blamed himself for the death of Maybelle Burris, the woman who was his primary caregiver during his childhood.

This issue arose during the direct examination of Dr. Richard Loughead, the psychologist who testified for Burris during the second sentencing trial. Counsel sought to introduce the self-blame evidence by having Dr. Loughead repeat what Burris had told him during their meetings. Dr. Loughead testified:

Q. Did you ever learn what became of Maybelle?

A. Yes, I did, from Gary.

Q. And what happened to her? Go ahead.

A. Maybelle Burris died of a heart attack. What happened is that Gary had come home from school and was trying to . . .

Tr.–II at 2162–63 (objections omitted).

The prosecutor objected to Dr. Loughead's answer as hearsay, and the state trial court sustained the objection. Burris now argues that his counsel were ineffective because they did not object to the state trial court's ruling that excluded this mitigation evidence. The State argues that the exclusion of such evidence did not deprive Burris of his right to a fair trial. The State contends that the fact that Burris may have blamed himself for the

death of Maybelle Burris does not diminish his culpability for Chambers' murder. Thus, the State argues that there is no reasonable probability that the presentation of such evidence would have influenced the jury to return a unanimous recommendation against the death penalty.

Indiana law clearly sets forth the types of mitigating circumstances that can be considered by a jury in order to determine whether a capital defendant should be recommended to receive the death penalty. *See* IND.CODE § 35–50–2–9(c).[16] Among the circumstances that may be considered are "[a]ny other circumstances appropriate for consideration." *See* IND.CODE § 35–50–2–9(c)(8). Thus, counsel's attempt to introduce evidence that Burris blamed himself for Maybelle Burris's death can arguably be considered mitigation evidence.

It is well settled that courts have long sanctioned the use of hearsay evidence at sentencing. *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980); *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1387 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995). There is no exception to this rule in a capital case. *See Williams v. New York*, 337 U.S. 241, 251, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1949). The Supreme Court of the United States has held that applying the rule against the admission of hearsay evidence to preclude the defendant from introducing certain mitigation evidence in a capital case violates due process. *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151–52, 60 L.Ed.2d 738 (1979).

In this case, when counsel attempted to introduce evidence of Burris's self-blame for the death of Maybelle Burris through Dr. Loughead, the state trial court excluded the evidence by sustaining the State's hearsay objection. Pursuant to the Supreme Court's holding in *Green*, this court must find that the state trial court's decision to exclude evidence of Burris's self-blame for the death of Maybelle Burris was improper and, thus, sentencing counsel's performances in failing to object to that decision were constitutionally deficient. As a result, under *Strickland*, this court must now determine whether Burris was prejudiced by counsel's error.

Burris has the burden of proving that absent counsel's failure to object to the state trial court's decision to exclude the self-blame evidence, the entire jury and Judge Gifford would have concluded that the balance of aggravating and mitigating circumstances did not warrant the imposition of a death sentence in this case. *See Jones v. Page*, 76 F.3d at 846. After reviewing such evidence in light of the entire record, it is this court's view that the presentation of Burris's self-blame evidence would not have produced a unanimous jury recommendation against death or a change in Judge Gifford's ultimate sentencing decision.

First, the evidence that Burris blamed himself for another person's death does not serve to diminish Burris's own culpability for the murder of Kenneth Chambers. At best, such evidence would serve only to strengthen the theory that Burris led a deprived childhood—a theory which was already well-supported by the evidence. Second, evidence of Burris's self-blame was in fact presented to Judge Gifford in a presentencing memorandum prepared for sentencing counsel by Michael Dennis, a case consultant. Tr.–II at 248. That memorandum was filed with the

---

**16.** Section 35–50–2–9(c) states in full:
(c) The mitigating circumstances that may be considered under this section are as follows:
(1) The defendant has no significant history of prior criminal conduct.
(2) The defendant was under the influence of extreme mental or emotional disturbance when the murder was committed.
(3) The victim was a participant in or consented to the defendant's conduct.
(4) The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.
(5) The defendant acted under the substantial domination of another person.
(6) The defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.
(7) The defendant was less than eighteen (18) years of age at the time the murder was committed.
(8) Any other circumstances appropriate for consideration.

court and was part of the record on which Judge Gifford based her decision to sentence Burris to death. As a result, this court cannot conclude that but for counsel's failure to object to the exclusion of the self-blame evidence, Burris would not have been sentenced to death. Therefore, under *Strickland,* the court holds that Burris has failed to establish he was prejudiced at sentencing by counsel's error, and accordingly, this claim must be dismissed.

## E. FAILURE TO CONSIDER AND WEIGH HUNG JURY AS A MITIGATING CIRCUMSTANCE

Burris also alleges that his appellate counsel were ineffective for failing to raise the issue that the state trial court violated his Eighth and Fourteenth Amendment rights by sentencing him to death without considering and weighing as a mitigating circumstance the jury's inability to reach a sentencing recommendation. In support of this claim, Burris argues that although jury sentencing in capital cases is not mandatory, the jury plays a significant role in death penalty jurisprudence. He contends that the Eighth and Fourteenth Amendments require that the sentencing judge be allowed to consider such mitigation evidence in deciding whether the death penalty should be imposed. Thus, he claims that appellate counsel were ineffective by failing to raise this claim on direct appeal. The State counters by arguing that Burris is incorrect on this point as a matter of law and that counsel's decision not to raise such a ground on appeal was not erroneous.

The Eighth Amendment permits a state trial court judge, acting alone, to impose a capital sentence and does not require a State to define the weight a sentencing judge must give to an advisory jury verdict. *Harris v. Alabama,* 513 U.S. 504, ——, 115 S.Ct. 1031, 1036–37, 130 L.Ed.2d 1004 (1995). In *Harris,* the Supreme Court upheld Alabama's capital sentencing scheme, which like Indiana's death penalty statute, requires jury participation in the sentencing process but gives ultimate sentencing author-

ity to the state trial court judge. 513 U.S. at ——, 115 S.Ct. at 1034; *see also* ALA.CODE § 13A–5–47(e). Further, Indiana's death penalty statute specifically provides for the scenario where the advisory jury is unable to return a unanimous sentencing recommendation: "If a jury is unable to agree on a sentence recommendation after reasonable deliberations, the court shall discharge the jury and proceed as if the hearing had been to the court alone." IND.CODE § 35–50–2–9(f). Thus, Indiana law is quite clear; if the jury is unable to unanimously agree on a sentencing recommendation, the judge is to proceed as if there had not even been a jury and sentencing had been to the court alone.[17] Accordingly, the petitioner's argument that the judge improperly failed to consider and weigh the jury's inability to agree on a sentencing recommendation as a mitigating factor is contrary to well-established law.

Moreover, as the respondent argues, the Eighth and Fourteenth Amendments require a capital sentencing authority to consider in mitigation only those aspects "of a defendant's character or record and any of the circumstances of the offense that the defendant prooffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Following *Lockett,* the court finds that the jury's inability to unanimously agree on a sentencing recommendation cannot be considered an aspect of Burris's character or record, or a circumstance related to the crime for which he was sentenced. Accordingly, the state trial court was not required to consider or weigh in support of mitigation the fact that the jury hung on its sentencing recommendation. As a result, Burris cannot establish that his appellate counsel were deficient for failing to raise such a meritless argument on direct appeal.

## F. EQUAL PROTECTION CLAIM

Burris's sixth allegation states that counsel failed to preserve for and present on appeal the issue that the state trial court denied Burris's rights under the Equal Protection

17. The Supreme Court of Indiana has went so far as to hold that "the failure [of the jury] to reach a recommendation should not be considered as a mitigating factor during the penalty phase." *See Roche v. State,* 596 N.E.2d 896, 899 (Ind.1992).

Clause of the Fourteenth Amendment when the jury was not allowed to have any role in his sentencing after the jury was unable to unanimously agree on a sentencing recommendation. The State argues that equal protection concerns are not implicated in this case because Indiana's death penalty statute applies equally to all capital defendants. Thus, the State submits that counsel's failure to preserve and present such a claim on appeal was not constitutionally defective.

██ Initially, the court finds that the Equal Protection Clause has not been transgressed in this case. It appears that the petitioner's argument is based on the premise that the failure to have a jury's recommendation be utilized in his sentencing determination sets him apart from other capital defendants whose juries do unanimously agree on a sentencing recommendation. A review of Section 35–50–2–9 of the Indiana Code clearly establishes that the Indiana death penalty statute applies equally to all criminal defendants that are charged with a capital crime. Each capital defendant who was convicted in a trial by jury is entitled, at sentencing, to have a jury hear evidence, deliberate and recommend whether the State has proved at least one aggravating factor and whether the aggravation evidence outweighs any mitigation evidence offered. Apparently, the petitioner believes that his equal protection rights were violated when Judge Gifford did not allow the jury to have any role in his sentencing after the jury was unable to unanimously agree on a sentencing recommendation. However, for the foregoing reasons, it this court's view that the petitioner's argument is without merit.

██ However, assuming for the sake of argument that Burris's equal protection rights have been implicated, the court finds that no constitutional violation exists in this case. The United States Courts of Appeals for the First, Fourth and Fifth Circuits have held that capital defendants are not a suspect class for equal protection purposes. *See Dickerson v. Latessa*, 872 F.2d 1116, 1119 (1st Cir.1989); *Evans v. Thompson*, 881 F.2d 117, 121 (4th Cir.1989), *cert. denied*, 497 U.S.

1010, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990); and *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987).[18] Thus, in this case, Indiana's death penalty statute must be presumed valid and sustained if it is found to be "rationally related to a legitimate state interest." *City of Cleburne, Texas v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). It is important to note that the death penalty scheme which the State of Indiana employs has been declared constitutional on several occasions. *See, e.g., Schiro v. Clark*, 963 F.2d 962, 969 (7th Cir.1992), *aff'd sub nom. Schiro v. Farley*, 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

In this court's view, the State of Indiana has a legitimate reason to treat a unanimous jury sentencing recommendation differently than a scenario where the jury is unable to reach a unanimous recommendation—capital sentencing is first and foremost a duty left to the state trial court judge by statute. As noted above, allowing a state court judge full authority in capital sentencing is constitutional. *See Harris*, 513 U.S. at ——, 115 S.Ct. at 1034. The Supreme Court of the United States has even held that a judge may impose the death penalty despite a jury's recommendation to the contrary, since a criminal defendant does not have a constitutional right to jury sentencing in capital cases. *Spaziano v. Florida*, 468 U.S. 447, 460–61, 104 S.Ct. 3154, 3162–63, 82 L.Ed.2d 340 (1984). The rationality of Indiana's death penalty statute is clear; as the respondent submits, by allowing an informed judge to perform the role of sentencer alone when a jury is unable to reach a unanimous recommendation, Indiana's death penalty procedure serves a judicial economy interest because it avoids the necessity of holding a second lengthy trial to a different jury that would be required if a hung jury was left a significant role in capital sentencing.

The reasoning behind this court's opinion that the petitioner has no constitutional support on this claim was succinctly summarized by the Supreme Court of Indiana in the recent decision in *Holmes v. State*, 671

**18.** See *Colby v. J.C. Penney Co., Inc.*, 811 F.2d at 1123, *supra* note 9.

N.E.2d 841 (Ind.1996). In *Holmes,* the Supreme Court held:

> The legislative decision that it is only the unanimous jury recommendation which should be given special consideration by the sentencing judge in a capital case rests upon at least two grounds. First, capital sentencing is a job for the judge. A jury may possibly be of assistance and aid to the judge, but the judge must make the final decision. Even when a jury unanimously recommends against the death sentence, the question of whether death is appropriate remains a judicial one. Second, there is the notion that the assistance and aid which is needed and beneficial to the proper functioning of the sentencing judge is that assistance and aid which is the product of a jury while operating at the same high level as required when rendering a verdict upon guilt or innocence. The basic values upon which the requirement of a unanimous jury recommendation rests are those values upon which rest the requirement of a unanimous jury verdict. Those values are threatened if nonunanimous jury recommendations were required to be considered by the sentencing judge. When the capital sentencing roles of judge and jury are seen in this light, it is apparent that the requirement that the sentencing judge consider the jury recommendation need not apply in the absence of a unanimous juror viewpoint.

671 N.E.2d at 852.

When the petitioner's claim is viewed in light of the applicable law, it is clear that the state trial court did not violate the petitioner's equal protection rights by not allowing the hung jury to play a significant role in sentencing. As a result, the petitioner cannot meet his burden under the first prong of *Strickland* since counsel did not err in failing to raise an equal protection claim on appeal. Thus, this claim must be dismissed.

**19.** See *Colby v. J.C. Penney Co., Inc.,* 811 F.2d at 1123, *supra* note 9.

**20.** As outlined above, this court reviews the remaining claims under the standards of § 2254(d) as amended. Thus, this court must independent-

### G. CUMULATIVE ERRORS

Finally, the petitioner also contends that the cumulative errors of sentencing and appellate counsel create a reasonable probability that had such errors not occurred, the jury would have returned a unanimous recommendation against the imposition of the death penalty and the state trial court judge would not have imposed the death sentence. As stated above, this court found that counsel's performances were in fact constitutionally deficient in only one instance—when counsel failed to object to the state court's exclusion of the mitigation evidence that Burris blamed himself for the death of Maybelle Burris. However, this court also found that Burris failed to fulfill the second prong of the *Strickland* test because he could not establish that he had been prejudiced by counsel's error.

As a result, Burris's inability to prevail fully on any one of his six claims of ineffective assistance of counsel precludes him from accumulating such claims to establish constitutional error. *See Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir.) (holding that errors that are not unconstitutional individually cannot be added together to create constitutional violation), *cert. denied,* —— U.S. ——, 117 S.Ct. 395, 136 L.Ed.2d 310 (1996).[19] Accordingly, the court now holds that the petitioner has failed to prove any violation of his right to the effective assistance of counsel guaranteed under the Sixth Amendment to the United States Constitution and, therefore, all of the petitioner's ineffective assistance of counsel claims are now dismissed.

### VII. ADMISSION OF VICTIM IMPACT EVIDENCE

Burris also raises four grounds for review which were presented for the first time in the state court on his direct appeal of the second death sentence.[20] First, Burris contends that the state trial court improperly overruled his motion *in limine* and permitted the introduction and consideration of evi-

ly determine whether the state court's decision on the merits of such claims is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

dence pertaining to an improper aggravating circumstance—victim impact evidence—in violation of the Eighth and Fourteenth Amendments to the United States Constitution. The evidence at issue here was presented through the testimony of the victim's mother, June Chambers. Ms. Chambers testified that her son was thirty-one years of age; that he was a graduate of Arsenal Technical High School; that he served in the United States Navy for six years; and that he was married and had two children when he was murdered in January 1980. Tr.–II at 1998–2001. Further, the State introduced a photograph of the victim in his United States Navy uniform through Ms. Chambers' testimony. Tr.–II at 2001.

The petitioner claims that such evidence should be considered "victim impact evidence" that was improperly admitted at the second sentencing trial. In support of this claim, Burris argues that Indiana's death penalty statute specifically lists the aggravating circumstances that can be alleged by the State to prove that a sentence of death is warranted.[21] Further, he submits that evidence pertaining to a non-statutory aggravating circumstance is inadmissible unless it is relevant to statutory aggravating and mitigating circumstances. *See Bivins v. State*, 642 N.E.2d 928, 956–57 (Ind.1994). Thus, Burris argues that since the impact of a crime on a victim's family and the personal characteristics of the victim are not aggravating circumstances under Indiana law, the victim impact evidence presented by the State was inadmissible. Consequently, he maintains that his death sentence must be vacated unless the reviewing court—in this case, the Supreme Court of Indiana—reweighed the remaining evidence or conducted a harmless error analysis consistent with the Constitution of the United States, citing *Parker v. Dugger*, 498 U.S. 308, 319, 111 S.Ct. 731, 738–39, 112 L.Ed.2d 812 (1991), and *Clemons v. Mississippi*, 494 U.S. 738, 741, 110 S.Ct. 1441, 1444, 108 L.Ed.2d 725 (1990).

The State submits that the admission of modest victim impact evidence was harmless and did not deprive Burris of his due process rights. The State argues that the petitioner has failed to allege, much less establish, that Judge Gifford or the jury relied upon this evidence as an aggravating circumstance. Further, the State contends that the Supreme Court of Indiana did indeed conduct the harmless error analysis that Burris argues it wrongfully omitted to perform. Thus, the respondent requests that the petitioner's claim be dismissed since said argument would require the creation of a "new rule" that could not be applied to his case retroactively pursuant to *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

This court must first address whether the state trial court's decision to allow June Chambers' testimony was proper in light of the petitioner's motion *in limine*. When the motion *in limine* was first filed, the state trial court sustained the motion; however, as the sentencing trial progressed, the trial court decided to allow the State to question the victim's mother on the limited topics of the victim's marital status, the fact that he had children, his record of military service and his work record. *See Burris*, 642 N.E.2d at 966. On direct appeal, the Supreme Court of Indiana found that the evidence elicited from Ms. Chambers was not directly related to an issue in the case. *Id.* However, the Supreme Court held that although the introduction of such limited victim impact evidence was impermissible, the state trial court's decision did not constitute reversible error "because it [did] no more than state the victim's status in life." *Id.*

It is this court's responsibility to determine whether the Supreme Court's finding that the decision to allow victim impact evidence was not reversible error is consistent with clearly established federal law as determined by the Supreme Court of the United States. In *Parker v. Dugger, supra,* the Supreme Court held that in a state which employs a system where the death penalty may be imposed only where specified aggravating circumstances outweigh all mitigating circumstances, "when a reviewing court strikes one or more of the aggravating factors on which the sentencer relies, the reviewing court may, consistent with the Con-

---

**21.** See Ind.Code § 35–50–2–9(b) for entire list of   available aggravating circumstances.

stitution, reweigh the remaining evidence or conduct a harmless error analysis." 498 U.S. at 318–319, 111 S.Ct. at 738 (citing *Clemons v. Mississippi*, 494 U.S. at 741, 110 S.Ct. at 1444).

The petitioner suggests that the victim impact evidence elicited from June Chambers was presented by the State as evidence supporting an aggravating circumstance. Thus, when the Supreme Court of Indiana found that such evidence should not have been admitted, the petitioner argues that the Supreme Court should have reweighed the evidence or conducted a harmless error analysis consistent with *Parker.* The State argues that the Supreme Court's holding that the admission of Ms. Chambers' testimony was not reversible error constituted the harmless error analysis suggested by *Parker* and *Clemons.*

■ Initially, this court finds that Burris has failed to allege any constitutional error in this claim for relief. At its essence, the petitioner contends that the state trial court's evidentiary ·ruling violated his Eighth and Fourteenth Amendment rights. However, the state trial court's decision was merely an error in the management of the sentencing trial, and the Seventh Circuit has held that, "procedural errors committed in the course of a state criminal trial are not a ground for federal habeas corpus." *Bell v. Duckworth,* 861 F.2d 169, 170 (7th Cir.1988), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989) (citing *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982)). Further, it is well settled that this court does not sit merely to determine questions of state law. *Estelle v. McGuire,* 502 U.S. 62, 67–69, 112 S.Ct. 475, 479–81, 116 L.Ed.2d 385 (1991); *Stewart v. Lane,* 60 F.3d 296, 302 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2580, 135 L.Ed.2d 1095 (1996).

In addition, as discussed above, the Supreme Court of the United States has held that a State may properly conclude that in order for a jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it, at the sentencing phase, evidence of the specific harm caused by the defendant. *Payne v. Tennes-*

*see,* 501 U.S. at 825, 111 S.Ct. at 2608. Thus, given the brevity of June Chambers' testimony and the fact that the state trial court limited the evidence to describing the victim's status in life, the decision to admit June Chambers' testimony was entirely proper under federal law. Therefore, Burris's claim that the state trial court improperly overruled his motion *in limine* and permitted the introduction of certain victim impact evidence should be dismissed as failing to allege a violation of the Constitution of the United States.

However, considering the importance of this case, the court is hesitant to strike down the petitioner's claim solely on a procedural technicality. Therefore, the court will review the state trial court's decision for harmless error as suggested by the Supreme Court of the United States in *Parker* and *Clemons.* The present standard for analyzing a claim for harmless error was first set forth by the Supreme Court of the United States in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In *Kotteakos,* the Court wrote:

> If, when all is said and done, the [court's] · conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764–765, 66 S.Ct. at 1248.

In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Court extended the application of the *Kotteakos* harmless error standard, holding that the standard should be applied in federal habeas petitions in order to determine whether habeas relief should issue when a constitutional error occurs at trial. 507 U.S. at 637, 113

S.Ct. at 1721–22. Thus, the Court held that habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.*

In *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Court set forth further guidance with respect to analyzing whether an error should be considered harmless under the *Kotteakos–Brecht* standard. In *O'Neal,* the Court held that: "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." 513 U.S. at ——, 115 S.Ct. at 994 (quoting *Brecht,* 507 U.S. at 622, 113 S.Ct. at 1713, and *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253). In addition, when conducting a harmless error analysis in a capital case, the court must consider whether the error was "harmless beyond a reasonable doubt." *Clemons,* 494 U.S. at 753, 110 S.Ct. at 1450–51.

■■■ In this case, the court is not in grave doubt with regard to the harmlessness of the state trial court's error (assuming that such error rises to the level of a constitutional violation). The petitioner has failed to allege any evidence that Judge Gifford, or the jury, relied on the testimony of June Chambers in weighing the existence of aggravating versus mitigating circumstances. In fact, a review of the record clearly indicates that the jury was not instructed to consider victim impact evidence as an aggravating factor. Tr.–II at 185–206. The state trial court instructed the jury with respect to aggravating circumstances as follows:

> The law provides for the penalty of death upon conviction for the crime of murder under the following circumstance(s). The Defendant Gary Burris: committed the

murder by intentionally killing the victim while committing the crime of robbery. Tr.–II at 188.

Further, Judge Gifford's own seven-page sentencing memorandum stated that only one aggravating circumstance was proved beyond a reasonable doubt by the State. Judge Gifford wrote: "Therefore, the Court finds the State proved beyond a reasonable doubt that the Defendant Gary Burris intentionally killed Kenneth W. Chambers while committing the crime of robbery." Tr.–II at 255. Again, no mention of June Chambers' testimony or the issue of victim impact evidence is made by Judge Gifford in her sentencing memorandum. Tr.–II at 2253–59.[22] Therefore, it was unnecessary for the Supreme Court of Indiana to reweigh the aggravating and mitigating circumstances without the victim impact evidence because such evidence was not relied upon by the jury or Judge Gifford in determining Burris's sentence.

Upon review of Judge Gifford's instructions to the jury and her own findings of fact and judgment with regard to the sentence, it is this court's view that the admission of victim impact evidence, although impermissible under Indiana law, did not result in actual prejudice to the petitioner, and, thus, constitutes harmless error under *Kotteakos, Brecht* and *O'Neal* beyond a reasonable doubt. Accordingly, this court holds that the decision of the Supreme Court of Indiana on this claim was consistent with clearly established federal law as determined by the Supreme Court of the United States and, consequently, such a claim must be dismissed under § 2254(d)(1).

## VIII. INDIANA'S DEATH PENALTY STATUTE FAILS TO NARROW THE CLASS OF DEATH–ELIGIBLE DEFENDANTS

Burris next submits that Indiana's death penalty statutory scheme fails to genuinely narrow the class of death-eligible defendants, making his sentence arbitrary and unreliable

---

**22.** It must be noted that Indiana's death penalty statute was recently amended to allow the state trial court, after receiving the jury's recommendation, to hear evidence of the crime's impact on members of the victim's family before making the final determination as to the defendant's sentence. *See* IND.CODE § 35–50–2–9(e), as amended by P.L. 216–1996, § 25. However, this amendment applies only to crimes committed after the date of its enactment—June 30, 1996—and cannot be applied to Judge Gifford's sentencing determination in this case.

in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, the petitioner contends that Section 35–50–2–9(b)(1)(G) of the Indiana Code, as applied, violates his constitutional rights because the aggravating circumstance alleged by the State merely mimics or repeats the elements of his underlying crime—felony murder. Thus, he claims that there is no way to distinguish his crime from those felony murder cases in which the defendant is not subjected to the death penalty. The State responds by arguing that the elements of the underlying crime of felony murder do not include a requirement that the murder be intentionally committed. Accordingly, the State concludes that Indiana's death penalty statute does not violate Burris's constitutional rights and, thus, that this claim should be dismissed.

On direct appeal, the Supreme Court of Indiana addressed and rejected Burris's argument. The Supreme Court stated:

> The question of whether appellant had committed a killing in the perpetration of a robbery in fact was found by the original trial jury. At that stage, it was not necessary that specific intent to kill be proved. *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, *reh'g denied,* 539 N.E.2d 4. The aggravating circumstance concerning appellant's intent throughout the entire episode was a matter to be determined upon fixing the sentence. The United States Supreme Court has held that a capital sentence procedure will satisfy the narrowing requirement as long as it "narrows the class of death eligible murders and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion." *Lowenfield v. Phelps* (1988), 484 U.S. 231, 247, 108 S.Ct. 546, 555, 98 L.Ed.2d 568, 583. The Supreme Court has further held that findings authorizing the imposition of the death penalty need not be made by a jury. *Walton v. Arizona* (1990), 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511.... As we stated previously in this opinion, the original jury in fact did find that appellant was guilty of deliberately killing a person in the perpetration of a robbery. In sentencing,

it was the prerogative of the trial judge to make the determination as to the specific circumstances surrounding such a killing in order to determine whether there was aggravation sufficient to sentence appellant to death. We do not agree with appellant's attempt to distinguish *Walton.* We find no error here.

*Burris,* 642 N.E.2d at 967.

In *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court of the United States held that "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" 484 U.S. at 241, 108 S.Ct. at 554 (quoting *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death—in so doing, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. *Id.* Indiana's statutory scheme is no different; the jury, or the judge if the jury is unable to agree on a sentencing recommendation, is not to recommend, or impose, the death penalty unless (1) the State has proved at least one aggravating circumstance beyond a reasonable doubt; and (2) any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. *See* IND.CODE § 35–50–2–9(k).

The Supreme Court of the United States further held that the narrowing function required for a regime of capital punishment may be provided in either of two ways: (1) the legislature may itself narrow the definition of capital offenses so that the jury finding of guilt responds to this concern; or (2) the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. *Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555. The State of Indiana

has adopted the second approach, listing fifteen (15) different groups of aggravating circumstances which qualify a defendant charged with murder for the death penalty. *See* IND.CODE § 35-50-2-9(b).

In *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Supreme Court further explained that individual aggravating circumstances must meet two requirements in order to be deemed constitutional. First, the aggravating circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. *Id.* at ——, 114 S.Ct. at 2635 (citing *Arave v. Creech*, 507 U.S. 463, 471, 113 S.Ct. 1534, 1540-41, 123 L.Ed.2d 188 (1993)). Second, the aggravating circumstance may not be unconstitutionally vague. *Id.* (citing *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-65, 64 L.Ed.2d 398 (1980)).

In this case, the aggravating circumstance alleged by the State was that Burris committed the murder of Kenneth Chambers by intentionally killing him while committing or attempting to commit the felony of robbery. *See* IND.CODE § 35-50-2-9(b)(1)(G). The petitioner contends that this aggravating circumstance merely mimics or duplicates the requirements for felony murder. However, the petitioner's argument is clearly incorrect as a matter of law.

Burris was charged and convicted of committing felony murder. Specifically, Burris was charged and convicted for killing "another person while committing or attempting to commit ... robbery." *See* IND.CODE § 35-42-1-1(2). Under Indiana law, specific intent to kill need not be proved to convict a defendant of felony murder. *See Vance v. State*, 620 N.E.2d 687, 690 (Ind.1993) (finding that "while the crime of murder does require specific intent to kill, the crime of felony murder, for which appellant herein was convicted, does not, requiring instead proof only of intent to commit the underlying felony"). Because the aggravating circumstance alleged against Burris required the State to prove beyond a reasonable doubt that Burris possessed the specific intent to kill the victim in furtherance of committing the felony robbery, it logically follows that the class of

death-eligible defendants is indeed narrowed by such an aggravating circumstance since the specific intent to kill is not a requirement for convicting a defendant of felony murder.

Therefore, this court finds that the aggravating circumstance listed in § 35-50-2-9(b)(1)(G) meets the two-prong test of *Tuilaepa*. First, it is clear that the aggravating circumstance alleged does not apply to every defendant convicted of felony murder. The specific intent to kill in furtherance of the commission of felony robbery sets this aggravating circumstance apart from the generic case of felony murder. Put another way, when a person who commits a felony robbery also causes an individual's death, though such a killing was *an unintended result* of the perpetration of the robbery, that person *does not* qualify for the death penalty under § 35-50-9-2(b)(1)(G). Second, the court also finds that the wording of § 35-50-2-9(b)(1)(G) could not be more clear—it is to be applied only when a defendant *intentionally* kills someone in furtherance of the commission of felony robbery. Therefore, in this court's view, § 35-50-2-9(b)(1)(G) is not unconstitutionally vague.

As a result, the court finds that the sole aggravating circumstance alleged against the petitioner was proven beyond a reasonable doubt and qualifies as constitutional aggravating circumstance under the Fifth, Sixth, Eighth and Fourteenth Amendments. Consequently, the petitioner's claim that § 35-50-2-9(b)(1)(G), as applied, violates his constitutional rights must be dismissed.

## IX. AGGRAVATING CIRCUMSTANCE DUPLICATED ELEMENT OF UNDERLYING CRIME AND REQUIRED A JURY'S DETERMINATION

The next ground challenged by the petitioner is related to the previous claim, in that it requires a finding by this court that the aggravating circumstance alleged by the State of Indiana functioned as an element of the crime for which the petitioner was convicted. Burris submits that in order to apply the aggravating circumstance alleged—that he intentionally killed Kenneth Chambers in

furtherance of the commission of felony robbery—a jury determination on that aggravating circumstance was necessary. The State responds by arguing that Burris has failed to cite any authority, much less clearly established federal law as determined by the Supreme Court of the United States, in support of such a challenge. Consequently, the State requests that this claim be dismissed.

As this court discussed above, the petitioner's argument that section 35–50–2–9(b)(1)(G) of the Indiana Code functions as an element of the crime of felony murder is clearly incorrect as a matter of law. The specific intent to kill in furtherance of the commission of a felony robbery sets this aggravating circumstance apart from the *mens rea* requirements which must be proved to convict a defendant of felony murder. *See Vance v. State, supra.* Accordingly, pursuant to *Tuilaepa v. California, supra,* this court found that the aggravating circumstance listed in § 35–50–2–9(b)(1)(G) was constitutional. As a result, the petitioner's initial premise on which this claim is based—that § 35–50–2–9(b)(1)(G) merely restates an element of the capital offense—is incorrect.

Moreover, the petitioner's conclusion that a jury determination on the alleged aggravating circumstance was constitutionally required also fails. In analyzing this issue on direct appeal, the Supreme Court of Indiana found:

> The Supreme Court has further held that findings authorizing the imposition of the death penalty need not be made by a jury. *Walton v. Arizona* (1990), 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511. Appellant attempts to distinguish *Walton* from the case at bar in that in *Walton* the specific findings authorizing the death penalty were not separate elements of the crime, whereas in this case he claims the issue of whether appellant personally and intentionally killed the victim is a determination that must be made by the jury.... We do not agree with appellant's attempt to distinguish *Walton.*

*Burris,* 642 N.E.2d at 967.

In *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court of the United States held that

"[a]ny argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." 497 U.S. at 647, 110 S.Ct. at 3054 (quoting *Clemons v. Mississippi,* 494 U.S. at 745, 110 S.Ct. at 1446–47). As noted above, the Supreme Court has also held that while a defendant is entitled to a jury's determination regarding the existence of the elements of a crime, a defendant is not constitutionally entitled to have a jury determine the appropriate punishment for that crime. *Spaziano v. Florida,* 468 U.S. at 460–461, 104 S.Ct. at 3162–63.

The petitioner attempts to distinguish the Court's holdings in *Walton* and *Spaziano* by arguing that the determination whether he personally and intentionally killed the victim in this case is a conclusion which cannot be classified merely as a standard or an aggravating circumstance. He claims that the assessment whether he intentionally killed the victim directly measures his "moral guilt" and overall culpability; thus, the aggravating circumstance requires an assessment that is traditionally left to a jury. *See Enmund v. Florida,* 458 U.S. 782, 800, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982). In support of this proposition, the petitioner cites to the decision of the United States Court of Appeals for the Ninth Circuit in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990). In *Adamson,* the Ninth Circuit held:

> In *Spaziano v. Florida,* the Supreme Court upheld Florida's "over-ride" provision which allows a judge to impose a death sentence despite a jury recommendation of life imprisonment. Never challenging the fundamental principle that criminal defendants are entitled to a jury trial, the Court's examination in *Spaziano* was limited to the constitutionality of judicial "sentencing" and evaluation of "the appropriate punishment to be imposed." The Court never addressed a claim of judicial fact-finding as to an element of the offense. Thus the Court never reached the particular contention Adamson has

raised: that Arizona's capital sentencing statute requires the judge to determine elements of the offense charged, thereby taking this factual element out of the jury's hands in violation of the Sixth Amendment.... Thus, *Spaziano* is not controlling in this case, as it left untouched the question of the right to a jury trial where the aggravating circumstances of a state's death penalty statute are elements of a capital offense.

865 F.2d at 1028–29 (footnote and citations omitted).

As the petitioner admits, the Ninth Circuit's decision in *Adamson* was abrogated by the Supreme Court's decision in *Walton.* Nevertheless, the petitioner submits that *Walton* only overruled *Adamson* as to the specific aggravating circumstances of Arizona's death penalty statute discussed in *Walton.* The petitioner argues that *Adamson* is still persuasive authority because *Adamson* goes far beyond the Supreme Court's holding in *Walton.* However, a careful review of Justice White's majority opinion in *Walton* precludes this court from adopting the petitioner's argument.

In *Walton,* the Supreme Court sought to resolve questions with regard to the constitutionality of the State of Arizona's death penalty statute. The Court specifically commented on the Ninth Circuit's holding in *Adamson,* which struck down portions of Arizona's death penalty statute as unconstitutional under the Sixth Amendment:

> Because the United States Court of Appeals for the Ninth Circuit has held the Arizona death penalty to be unconstitutional for the reasons submitted by Walton in this case, we granted certiorari to resolve the conflict and *to settle issues that are of importance generally in the administration of the death penalty.*

497 U.S. at 647, 110 S.Ct. at 3054 (citations omitted, emphasis supplied). The Court went on to discuss the role aggravating circumstances in capital cases:

> Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment. Thus, under Ari-

zona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (*i.e.,* require the death penalty), and the failure to find any particular aggravating circumstance does not "acquit" a defendant (*i.e.,* preclude the death penalty).

*Id.* at 648, 110 S.Ct. at 3054 (quoting *Poland v. Arizona,* 476 U.S. 147, 156, 106 S.Ct. 1749, 1755–56, 90 L.Ed.2d 123 (1986)). The *Walton* Court then addressed the *Enmund* decision:

> *Enmund* only places "a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." If the Constitution does not require that the *Enmund* finding be proved as an element of the offense of capital murder, and does not require a jury to make the finding, we cannot conclude that a State is required to denominate aggravating circumstances "elements" of the offense or permit only a jury to determine the existence of such circumstances.

*Id.* at 649, 110 S.Ct. at 3055 (citations omitted) (quoting *Cabana v. Bullock,* 474 U.S. 376, 385 n. 3, 106 S.Ct. 689, 696 n. 3, 88 L.Ed.2d 704 (1986)). The Court concluded by holding that the Arizona capital sentencing scheme does not violate the Sixth Amendment. *Id.*

This court finds the decision in *Walton* to be quite clear—the Sixth Amendment does not require a jury to make a determination on an aggravating circumstance alleged at sentencing if that circumstance is not an element of the crime for which the capital defendant is convicted. Thus, it is this court's view that the decision in *Walton* completely abrogates the Ninth Circuit's holding in *Adamson.*

Therefore, since this court has found that the aggravating circumstance listed in § 35–50–2–9(b)(1)(G) was not an element of the crime of felony murder for which Burris was convicted, the court now finds that said aggravating circumstance did not require a jury determination under the Sixth Amendment and *Walton.* Accordingly, the petitioner's claim must be dismissed under

§ 2254(d)(1) since the Supreme Court of Indiana's adjudication on the merits of this claim did not result in a decision contrary to clearly established federal law as determined by the Supreme Court of the United States.

### X. CHALLENGE TO FINAL JURY INSTRUCTION

Burris's final challenge to his second death sentence involves the propriety of the final instructions given to the jury by Judge Gifford. Specifically, Burris claims that Judge Gifford improperly overruled his objection to a final instruction that he claims erroneously informed the jury that the court must sentence the petitioner to a term of years if the jury did not recommend the death penalty. The instruction at issue was Instruction No. 28, which read as follows:

> The law states that a defendant will not be eligible for parole until he has served as [sic] least one half of any sentence.
>
> If you decide that death is not the appropriate penalty in this case sentencing is up to the court. The court must then sentence Gary Burris on the murder conviction to a term of years. The minimum sentence the court could impose is thirty years. The maximum sentence the court could impose is sixty years. There is no way to predict at this point what sentence the court might impose on the murder conviction.

Tr.–II at 199.

The petitioner contends that the instruction was improperly given because it is an incorrect statement of the law and, thus, violated his rights under the Eighth and Fourteenth Amendments. He argues that § 35–50–2–9 does not mandate that the state trial court sentence a defendant to a term of years if the jury recommends against the death penalty. Thus, Burris maintains that in a case where a jury plays a role in setting the penalty, a jury instruction which erroneously states the law regarding the possible sentence is prejudicial and denies the defendant due process, citing *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).

The State argues that the petitioner's challenge was not raised as a federal claim in the state courts and, thus, it should be deemed waived under the doctrine of procedural default. Even if the claim is not subject to procedural default, the State argues, in the alternative, that any error in giving the instruction was harmless since the jury instructions, when read as a whole, sufficiently advised the jurors of their advisory role in sentencing. Therefore, the State requests that this claim be dismissed.

On direct appeal of the second death sentence, the Supreme Court of Indiana addressed this issue at some length. The court stated:

> Appellant claims the language of the instruction would indicate to the jury that if they failed to recommend death the court would be required to impose a sentence of years. Taken alone, it would be possible for a person to reach such a conclusion from the wording of this instruction, and, of course, such an interpretation would be error. It is clear from the statute that the jury's recommendation in this regard whether it be for the death penalty or against the death penalty is a recommendation only. The trial judge in this case was free to exercise her discretion as to whether to sentence appellant for a term of years or impose the death penalty.
>
> Although the language of the above instruction is not artfully drawn, when one considers it in conjunction with the other instructions given, it is clear the jury was properly informed that their recommendation was not binding on the trial court and that the court would fix the penalty within the parameters of the statute. We would further point out that appellant concedes that he did not present this objection to the trial court and that it would normally be waived, citing *Ingram v. State* (1989), Ind., 547 N.E.2d 823. However, he asserts that the giving of the instruction above quoted is fundamental error. We cannot agree with appellant's observation.

*Burris,* 642 N.E.2d at 965.

The respondent submits that this claim has been procedurally defaulted because the petitioner failed to raise it as a federal issue in his direct appeal to the Supreme Court of

Indiana. A review of the record establishes that Burris's counsel did object to this instruction at the second sentencing trial, citing the decision of the Supreme Court of Indiana in *Brewer v. State*, 417 N.E.2d 889 (Ind.1981). Tr.–II at 2228–2230. However, that objection was overruled by Judge Gifford. Tr.–II at 2245–46. It does appear from the state court record that Burris indeed failed to frame this issue as a violation of the Due Process Clause at the state court level. However, erring on the side of extreme caution in light of the high stakes involved in this case, this court will not dismiss this claim under the doctrine of procedural default. Therefore, the court will now address the merits of this challenge under the Due Process Clause.

The Supreme Court of the United States has held that capital sentencing proceedings must satisfy the dictates of the Due Process Clause. *Clemons v. Mississippi*, 494 U.S. at 746, 110 S.Ct. at 1447 (1990). In determining the effect of a final jury instruction on the validity of a conviction and sentence, it is a well-established proposition that a single jury instruction may not be judged in artificial isolation, but must be viewed in the context of the totality of the overall charge to the jury. *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973) (citing *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926)).

The petitioner argues that Instruction No. 28 denied him due process because the instruction was incorrect as a matter of law, in that it instructed the jurors that if they recommended against the death penalty, the judge was mandated to sentence the petitioner to a term of years in prison. The first question that this court must answer is whether Judge Gifford's decision to give the instruction over the petitioner's objection was erroneous under the Due Process Clause. Second, if such an error exists, this court must then determine whether the error was fundamental or merely harmless under the standards of *Kotteakos*, *Brecht* and *O'Neal*, *supra*.

First, in determining whether Judge Gifford erred in instructing the jury, it is neces-

sary to review the relevant portions of Indiana's death penalty statute—§ 35–50–2–9. Section 35–50–2–9(d) states that the court *shall* instruct the jury concerning the statutory penalties for murder, the potential for consecutive and concurrent sentencing, and the availability of good time credit and clemency. Subsection (e) provides that the jury is to *recommend* to the court whether the death penalty or life imprisonment without parole, or neither, should be imposed; however, the state trial court is left to make the final determination of the sentence after considering the jury's recommendation. *See* IND.CODE § 35–50–2–9(e).

The petitioner disagrees with that portion of Instruction No. 28 which states: "If you decide that death is not the appropriate penalty in this case sentencing is up to the court. *The court must then sentence Gary Burris on the murder conviction to a term of years.*" Tr.–II at 199 (emphasis supplied). The petitioner cites to the decision of the Supreme Court of the United States in *Hicks v. Oklahoma, supra*, for the proposition that in a case where a jury plays a role in setting the penalty, a jury instruction which erroneously states the law regarding the possible sentence is prejudicial and denies the defendant due process.

■ However, this court does not find *Hicks* to be controlling or relevant. First, *Hicks* was not a capital case; the petitioner had only been convicted of the unlawful distribution of heroin. *See* 447 U.S. at 344, 100 S.Ct. at 2228. Second, the State of Oklahoma gave the defendant a statutory right to have a jury fix his punishment. *Id.* In Indiana, as discussed extensively above, the state trial court is to discharge the jury and proceed with sentencing as if sentencing had been to the court alone when the advisory jury cannot reach a unanimous sentencing recommendation. *See* IND.CODE § 35–50–2–9(f). Further, as the respondent appropriately states, the decision in *Hicks* stands only for the rule that where state law gives a defendant the right to have his sentencing determined by a jury, the state may not arbitrarily deprive the defendant of that right. Because Judge Gifford appropriately discharged the jury in this case, this court

finds that the decision in *Hicks* is not controlling on this claim.

Burris challenges the propriety of Instruction No. 28 because he contends that the instruction incorrectly stated that the state trial court was *required* to sentence the petitioner to a term of years if the jury unanimously recommended against imposing the death penalty. A review of Indiana's death penalty statute establishes that the petitioner is correct; nowhere *in that section,* § 35–50–2–9, does it state that a defendant *must* be given a term of imprisonment if the jury fails to recommend the death penalty. However, when the state trial court's final instructions to the jury are read in their totality and not in isolation, it is clear that Burris's due process rights have not been violated.

Judge Gifford instructed the jurors that they were to consider both aggravating and mitigating circumstances and *recommend* whether the death penalty should be imposed. *See* Tr.–II at 189. In addition, Judge Gifford instructed the jury that the court was not bound by their recommendation. *Id.* These instructions were solidified by a later instruction which read, "[w]hatever your decision in this case may be, the court may override that decision if the facts are so clear and convincing that virtually no reasonable person could differ." Tr.–II at 201. When the court's final instructions to the jury are read in their entirety, it is this court's view that the jury was properly instructed with regard to its advisory role and that the judge had the power to accept the jury's recommendation or reject it if the court thought the recommendation was unreasonable. Therefore, this court finds that the state trial court's slight misstatement of the law does not amount to a due process error in this case.

■ However, assuming, arguendo, that the petitioner could in fact establish a due process violation, the court finds that such an error would be harmless under the standards of *Kotteakos, Brecht* and *O'Neal, supra.* Al-

though the petitioner is correct that the court's instruction was a misstatement of the law if § 35–50–2–9 is read in isolation, the state trial court's instruction is not fundamentally in error because the petitioner has failed to take the extra step in properly interpreting Indiana's other sentencing procedures. Besides setting forth the procedures for sentencing with regard to the death penalty, the Indiana Code also establishes sentencing guidelines for the different types of crimes for which a defendant can be convicted. In this case, the petitioner was convicted of felony murder. Thus, if the death penalty had not been sought in this case, the state trial court would have been required to follow the Indiana sentencing procedures for generic felony murder cases. The guidelines for sentencing in murder cases are set forth in IND.CODE § 35–50–2–3, which stated as follows in 1991:[23]

  (a) A person who commits murder *shall* be imprisoned for a fixed term of forty (40) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances; in addition he may be fined not more than ten thousand dollars ($10,000).

  (b) Notwithstanding subsection (a), a person who was at least sixteen (16) years of age at the time the murder was committed may be sentenced to death under section 9 of this chapter.

IND.CODE § 35–50–2–3 (1991) (emphasis supplied).

If Judge Gifford had decided against sentencing Burris to death, her instruction to the jury would have been correct; she would have been required to sentence Burris to no less than thirty (30) and no more than sixty (60) years in prison. However, under Indiana law, Judge Gifford had two sentencing options open to her: (1) she could have sentenced the petitioner to death pursuant to § 35–50–2–9(g); or (2) she could have sentenced him to a term of years consistent with

---

**23.** The court must note that this section has been revised three separate times since Burris's second death sentence was imposed in 1991. Presently, a person who commits murder shall be imprisoned for a fixed term of between forty-five

(45) and sixty-five (65) years, depending upon aggravating or mitigating circumstances as determined by the state trial court. *See* IND.CODE § 35–50–2–3 (1996).

§ 35–50–2–3. Because Judge Gifford *could* have overridden a unanimous jury recommendation against imposing the death penalty, this court finds that the state trial court's final jury instruction which stated that the court was mandated to impose a term of years if the jury recommended against the death penalty was erroneous since the instruction did not clearly set forth the current state of the law in Indiana.

However, the petitioner's problem here is that the error he alleges works in his favor. Had the jury recommended that he receive the death penalty, Burris could conceivably argue that the jury was confused by the error and, thus, that the court's misstatement worked a fundamental error. However, since the jury failed to reach a unanimous recommendation on his sentence, the state trial court correctly discharged the jury and proceeded as if the sentencing had been by the court alone. *See* IND.CODE § 35–50–2–9(g). Further, if Burris would not have been sentenced to death, Judge Gifford would have been mandated to sentence Burris to a term of between thirty (30) and sixty (60) years in prison in accordance with § 35–50–2–3, as it read in 1991, and the state trial court's instruction. Therefore, because Burris, at best, would have been sentenced to a term of years had Judge Gifford decided against imposing the death penalty, this court finds that Burris was not prejudiced by the possible error. Since Burris fails to establish the requisite prejudice, any error in the final jury instructions must be considered harmless under the applicable law of the Supreme Court of the United States. As a result, the petitioner's due process challenge to the court's final jury instructions must be dismissed.

## XI. CONCLUSION

Supreme Court Justice Thurgood Marshall once noted that "[b]ecause of the unique finality of the death penalty, its imposition must be the result of careful procedures and must survive close scrutiny on post-trial review." *Coleman v. Balkcom,* 451 U.S. 949, 955, 101 S.Ct. 2031, 2035, 68 L.Ed.2d 334 (1981) (Marshall, J., dissenting on denial of petition for writ of certiorari). A review of the post-trial procedural background of this case clearly establishes that Mr. Burris has received, time and again, close scrutiny on his challenges to his conviction and death sentence both from the courts of the State of Indiana and the federal courts of the Seventh Federal Circuit. In fact, the Supreme Court of Indiana has reviewed aspects of this case on four different occasions; this court has at three separate times addressed issues relating to Burris's felony murder and death sentence; the United States Court of Appeals for the Seventh Circuit has received this case on appeal twice (once while sitting *en banc* ); and the Supreme Court of the United States has even had occasion to review a petition for writ of certiorari. Thus, it is without question that Burris has received a plentitude of post-trial judicial review of his conviction and death sentence.

Further, it is this court's opinion that the claims raised in Burris's second petition now before the court have been carefully addressed, once in part by the Supreme Court of Indiana and now by this federal district court. For the foregoing reasons, this court holds (1) that the performances of Burris's sentencing and appellate counsel were all within the requirements of the Sixth Amendment and the decision of the Supreme Court of the United States in *Strickland v. Washington, supra;* (2) that the state trial court did not violate Burris's constitutional rights by admitting limited victim impact evidence; (3) that Indiana's death penalty statute properly narrows the class of death-eligible defendants and, thus, does not violate the Eighth and Fourteenth Amendments; (4) that the aggravating circumstance alleged by the State of Indiana did not require a jury determination and, thus, was constitutional under the Fifth, Sixth, Eighth and Fourteenth Amendments; and (5) that the state trial court's final instructions to the jury, when viewed in their totality, did not violate Burris's due process rights.

Accordingly, this court now **DENIES** the petitioner's request for an evidentiary hearing under 28 U.S.C. § 2254(e)(2). In addition, the court also **DENIES** the petitioner's *ex parte* motion for appointment of a neuro-

psychologist pursuant to 21 U.S.C. § 848(q)(9).

Finally, after a careful review of the entire state court record, the petition, all responses and supplemental memoranda, and all exhibits filed in support thereof, this court now finds that Gary Burris's second sentence of death was constitutionally imposed in all respects. Therefore, in this court's reasoned opinion, there exists no reason why Burris's death sentence should not be carried out at a time to be determined by the Supreme Court of Indiana. Consequently, this court now **DENIES** Mr. Burris's second federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, and this cause is hereby **DISMISSED WITH PREJUDICE.** The Clerk shall forthwith enter judgment accordingly.

**IT IS SO ORDERED.**